PEOPLE v KURYLCZYK

Docket No. 91867. Argued January 13, 1993 (Calendar No. 2). Decided
    August 20, 1993. Certiorari denied by the Supreme Court of
    the United States on January 10, 1994, 510 US — (1994).

Albin J. Kurylczyk was convicted in the St. Clair Circuit Court,
    Peter E. Deegan, J., of bank robbery and the possession of a
    firearm during the commission of a felony, and subsequently
    pleaded guilty of being an habitual offender, second offense.
    The Court of Appeals, BRENNAN, P.J., and MICHAEL J. KELLY
    and D. F. WALSH, JJ., affirmed in an unpublished opinion per
    curiam (Docket No. 117099). The defendant appeals, asserting
    that he was entitled to the assistance of counsel during a
    photographic lineup conducted before his arrest and that photo-
    graphic and corporeal lineups were impermissibly suggestive.

    I. In an opinion by Justice GRIFFIN, joined by Justice
MALLETT, and an opinion by Justice BOYLE, joined by Justice
RILEY, the Supreme Court held:

    The trial court did not err in denying the defendant's motion
to exclude evidence of the photographic and corporeal lineup
identifications.

    1. The Sixth Amendment right of counsel is not required at a
photographic lineup unless the accused is in custody. Only
under unusual circumstances may a suspect who is not in
custody have a right to counsel during a pretrial photographic
identification. In this case, although the defendant was a pri-
mary suspect, he had not been arrested previously and had not
been identified by any witness as the robber; nor was he the
only suspect being investigated. In the photographic array, a
photograph of another suspect was included. Under these cir-
cumstances, the appointment of counsel was neither necessary
nor feasible.

    2. Differences in the composition of photographs, in the
physical characteristics of the individuals photographed, or in

REFERENCES

Am Jur 2d, Constitutional Law § 842; Criminal Law §§ 732, 734,
    800, 802, 803, 974; Evidence § 371.4.

Admissibility of evidence of photographic identification as affected
    by allegedly suggestive identification procedures. 39 ALR3d 1000.

the clothing worn by a defendant and the others pictured do not render a photographic lineup impermissibly suggestive. A suggestive lineup is not necessarily constitutionally defective; it is improper only if, under the totality of the circumstances, there is a substantial likelihood of misidentification. The relevant inquiry is whether it was unduly suggestive in the light of all the circumstances. In this case, the trial court did not clearly err in finding that there was no substantial likelihood of misidentification. No testimony was elicited from the witnesses indicating that the defendant's photograph was chosen because of any suggestive features. Rather, the testimony permitted the trial court to conclude that the defendant would have been identified, regardless of any suggestive features of his photograph or the publication of the surveillance photographs. Because the photographic array was not impermissibly suggestive, it did not taint subsequent in-court identifications.

3. The suggestiveness of a corporeal lineup, like a photographic lineup, must be examined in light of the totality of the circumstances. Generally, physical differences between a suspect and other lineup participants, in and of themselves, do not constitute impermissible suggestiveness. Like the viewing of surveillance photographs, the publication of photographs does not taint a subsequent lineup where the witness' identification is not unduly influenced by the published photographs. In this case, nothing in the record demonstrates clear error by the trial court in concluding that the corporeal lineup was not impermissibly suggestive.

II. In an opinion by Justice GRIFFIN, joined by Justice MALLETT, and an opinion by Justice BRICKLEY, joined by Chief Justice CAVANAGH and Justice LEVIN, the Supreme Court also held:

Any error in admitting identification testimony by the bank manager was harmless beyond a reasonable doubt.

Where testimony is erroneously admitted, reversal is required if an average jury would have found the prosecution's case significantly less persuasive without that testimony. However, the error is considered to be harmless if it can be shown beyond a reasonable doubt that the erroneously admitted testimony did not affect the jury's verdict.

Affirmed.

Justice BOYLE, joined by Justice RILEY, concurring in part and dissenting in part, additionally stated that the testimony of the bank manager did not rise to the level of a cognizable claim of denial of due process. Due process would be offended only if the police had done something so suggestive in the light of all

the circumstances that it led to a substantial likelihood of misidentification. There is no indication in the record of impermissible police conduct.

Justice BRICKLEY, joined by Chief Justice CAVANAGH and Justice LEVIN, concurring in part and dissenting in part, stated that given the suggestiveness of the photographic array in this case and the lack of reliability of the identifications under the totality of the circumstances, the array was impermissibly suggestive and the trial court erred in permitting identification testimony about the array. However, even if the exposure of the witnesses tainted their subsequent identifications, the error was harmless in light of the other evidence offered against the defendant.

1. EVIDENCE — PHOTOGRAPHIC LINEUPS — RIGHT TO COUNSEL.

The Sixth Amendment right of counsel is not required at a photographic lineup unless the accused is in custody; only under unusual circumstances may a suspect who is not in custody have a right to counsel during a pretrial photographic identification (US Const, Am VI).

2. EVIDENCE — PHOTOGRAPHIC LINEUPS — SUGGESTIVENESS.

Differences in the composition of photographs, in the physical characteristics of the individuals photographed, or in the clothing worn by a defendant and the others pictured do not render a photographic lineup impermissibly suggestive; a suggestive lineup is not necessarily constitutionally defective; it is improper only if, under the totality of the circumstances, there is a substantial likelihood of misidentification; the relevant inquiry is whether it was unduly suggestive in the light of all the circumstances.

3. EVIDENCE — CORPOREAL LINEUPS — SUGGESTIVENESS — PREVIEW OF PHOTOGRAPHS.

The suggestiveness of a corporeal lineup, like a photographic lineup, must be examined in light of the totality of the circumstances; generally, physical differences between a suspect and other lineup participants, in and of themselves, do not constitute impermissible suggestiveness; like the viewing of surveillance photographs, the publication of photographs does not taint a subsequent lineup where the witness' identification is not unduly influenced by the published photographs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Robert J. Nickerson,*

Prosecuting Attorney, and *Timothy K. Morris,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Amy Neville*) for the defendant.

GRIFFIN, J. Defendant challenges his convictions of bank robbery[1] and possession of a firearm during the commission of a felony[2] on the ground that pretrial procedures used for identification purposes deprived him of his constitutional rights of the assistance of counsel[3] and a fair trial.[4] Upon review, we find no error requiring reversal and affirm the decision of the Court of Appeals.

I

On August 8, 1988, the Fort Gratiot branch of the People's Bank in Port Huron was robbed of more than $22,000 (including approximately $600 in Canadian currency) by a man armed with a sawed-off shotgun who escaped in an older model black Chrysler. Three bank tellers, the branch manager, and a customer witnessed the robbery and gave descriptions of the robber and his car to investigators. In addition, photographs of the robber were taken by the bank's surveillance camera. The photographs matched the descriptions given by the eyewitnesses: The perpetrator was a heavy, white man wearing a baseball cap, a short-sleeved shirt, and jeans, and he had a wallet attached to a chain extending from a belt or belt loop, commonly referred to as a trucker's wallet.

After two of the surveillance photographs were

[1] MCL 750.531; MSA 28.799.
[2] MCL 750.227b; MSA 28.424(2).
[3] US Const, Am VI; Const 1963, art 1, § 20.
[4] US Const, Am XIV; Const 1963, art 1, § 17.

published in a local newspaper a few days after the crime, the St. Clair County Sheriff's Department received several phone calls regarding the robbery. At least one caller identified defendant Albin Kurylczyk as the man in the photographs. This information prompted a detective and an FBI agent to visit defendant at his home on August 17, 1988. At their request, defendant permitted the officers to search his house and his car, which was similar to the getaway car described by the eyewitnesses. He also agreed to accompany the investigators to the local police station for further interviews. Once there, he consented to be photographed by the detective. At that time, he was not represented by counsel, nor did he make any request for counsel.

On the same day that defendant was being interviewed, other deputies responded to a call from the bank. Two of the tellers believed the robber may have returned when a customer, dressed like the robber, entered the bank and attempted to exchange some Canadian currency. The tellers detained him by delaying his transaction until the deputies arrived. However, after an investigation, the law enforcement authorities were satisfied that this customer was not the bank robber. He was not included in any of the subsequent identification procedures that are challenged in this appeal.

Two days later, on August 19, the detective assembled an array of six photographs, including the photograph he had taken of defendant and one of another suspect. The array was shown to two of the five eyewitnesses, bank tellers Mary Kamendat and Cindy Dortman. Both identified defendant Kurylczyk as the bank robber. As a result, defendant was arrested and arraigned.

Following the arraignment on August 20, 1988,

as he was being led from the courthouse, defendant's photograph was taken by a news reporter. This photograph, a close-up shot of defendant's face, later appeared in color on the front page of the local newspaper.

On August 26, 1988, after publication of the color photograph in the newspaper, defendant participated in a corporeal lineup, at which he was represented by counsel. All six men in the lineup wore "jail greens"—standard issue pants for individuals being held in jail—and light blue short-sleeved shirts. The five witnesses from the bank were taken separately into the lineup room to view the men. Each witness identified defendant as the robber, and each provided in writing her reasons for making that identification.

Before trial, defendant moved to exclude the identification testimony of the eyewitnesses. A *Wade* hearing was conducted,[5] at which defendant first argued that the photograph identification procedure was tainted. He claimed that the arrangement and size of the pictures caused his photograph to stand out from the others. Pointing to the publication in the newspaper of the bank's surveillance photograph, defendant argued that the witnesses had relied on the published photograph, rather than on their own memories of the actual robbery. Finally, defendant contended that the photographic lineup was defective because he was not then represented by counsel.

Defendant next argued that the corporeal lineup was also tainted. As with the array of photographs, he claimed that he was singled out from

[5] *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). The hearing is incorrectly identified as a *Walker* hearing at several points in the record of this case. *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965). See *People v Carter,* 415 Mich 558, 596; 330 NW2d 314 (1982).

the others by his clothing and appearance. In addition, he asserted that publication in the local newspaper of the surveillance photographs and the postarraignment photograph had rendered defective the identifications made by witnesses at the corporeal lineup.

The trial court denied the motion, finding that neither the photographic lineup nor the corporeal lineup was impermissibly suggestive; indeed, the trial judge stated that he was "astounded" at the similarity of the individual participants in both lineups and concluded that the pretrial identification process had not been improperly affected by the published photographs.

At trial, all five eyewitnesses testified regarding their pretrial identifications of defendant, and each also identified defendant in court as the person who robbed the bank. Defendant testified in his own defense and presented testimony by neighbors and business acquaintances in support of an alibi defense and his reputation for truthfulness. Defendant also presented expert testimony regarding the nature of eyewitness identifications and the likelihood of erroneous identification.

The jury convicted defendant of the bank robbery and felony-firearm charges. Subsequently, he pleaded guilty to a second felony habitual offender charge,[6] and was sentenced to ten to forty years imprisonment and to a two-year consecutive term for the felony-firearm conviction. The Court of Appeals affirmed in an unpublished per curiam opinion. This Court then granted leave to appeal. 439 Mich 1002 (1992).[7]

[6] Defendant had been convicted of breaking and entering when he was nineteen.

[7] The grant order provided that "the delayed application for leave to appeal is considered, and it is granted, limited to the issue of whether pretrial identification procedures deprived the defendant of a fair trial."

II

Defendant presents two challenges to the photographic lineup that was conducted before his arrest. First, he contends that he was entitled to the assistance of counsel during the photographic lineup. Second, he argues that the photographic lineup was impermissibly suggestive in violation of his Fourteenth Amendment right of due process. We shall consider each of these challenges in turn.

A

The Sixth Amendment of the United States Constitution guarantees one who has been criminally accused the right "to have the Assistance of Counsel for his defence." This right is not limited to the formal trial, but extends to all " 'critical' stages" of the criminal proceeding. *United States v Wade,* 388 US 218, 224; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). For example, a person accused of a crime has the right to counsel at certain pretrial arraignments, *Powell v Alabama,* 287 US 45; 53 S Ct 55; 77 L Ed 158 (1932), or during custodial interrogations, *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). Indeed, "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Wade,* 388 US 226.

In *Wade,* the Court referred to the postindictment corporeal lineup as a "confrontation compelled by the State between the accused and the victim or witnesses to a crime," 388 US 228, and ruled that it is a critical stage of the prosecution at which the accused is as much entitled to the aid of counsel as at the trial itself. 388 US 237.

Six years later, the Court determined that "the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." *United States v Ash,* 413 US 300, 321; 93 S Ct 2568; 37 L Ed 2d 619 (1973). Noting that the accused is not present at such a photographic display, the Court compared this procedure to "the prosecutor's other interviews with the victim or other witnesses before trial." 413 US 325. The Court was "not persuaded that the risks inherent in the use of photographic displays are so pernicious that an extraordinary system of safeguards is required." 413 US 321.

Although the United States Supreme Court decisions do not require counsel at a photographic lineup, defendant argues that decisions of this Court do impose such a requirement. He maintains that Michigan courts have been more suspicious of photographic identifications than the federal courts, and have therefore imposed greater safeguards regarding their use.

Defendant relies primarily on our decision in *People v Franklin Anderson,* 389 Mich 155; 205 NW2d 461 (1973). There, this Court extensively reviewed numerous cases from other jurisdictions, as well as the psychological literature regarding photographic identifications and concluded that

> there are serious problems concerning the accuracy of eyewitness identification and that real prospects for error inhere in the very process of identification completely independent of the subjective accuracy, completeness or good faith of witnesses. [389 Mich 180.]

Because of the Court's distrust of photographic

identification procedures, two rules were established regarding their use:

> 1. *Subject to certain exceptions, identification by photograph should not be used where the accused is in custody.*
>
> 2. *Where there is a legitimate reason to use photographs for identification of an in-custody accused, he has the right to counsel as much as he would for corporeal identification procedures.* [389 Mich 186-187. Emphasis in original.]

As clearly indicated, these rules are triggered when a defendant is in custody. In this case, defendant was not in custody; however, he argues that the requirement of counsel applies to the photographic lineup conducted before his arrest. He asserts that subsequent decisions of this Court and the Court of Appeals have extended the *Franklin Anderson* counsel requirement to a defendant who is the focus of a police investigation, regardless of whether he is in custody.[8]

---

[8] Because defendant was not in custody, the first *Franklin Anderson* rule does not apply. That rule prohibits the use of photographic lineups only when a suspect is in custody or when he can be compelled by the state to appear at a corporeal lineup. See *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974). While it is arguable that the police could have compelled defendant's participation in a corporeal lineup by arresting him, defendant does not advance such an argument. In fact, defendant concedes that there would be numerous problems with a rule requiring police officers to arrest a suspect as soon as probable cause is established simply because they wanted to obtain some sort of identification. See *People v Wilson,* 95 Mich App 93; 290 NW2d 89 (1980). We agree with the Court of Appeals in *People v Cotton,* 38 Mich App 763, 768-769; 197 NW2d 90 (1972), where it said:

> Initial identification by photograph has been widely and effectively used in law enforcement. The display of photographs has proven to be a valuable tool in apprehending offenders while at the same time "sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v United States,* 390 US 377; 88 S Ct 967; 19 L Ed 2d 1247 (1968). Properly

Various Court of Appeals decisions have held that counsel is required at a photographic lineup when the suspect is the focus of a police investigation. See, e.g., *People v DeMeyers*, 183 Mich App 286; 454 NW2d 202 (1990); *People v Johnson (On Remand)*, 180 Mich App 423; 447 NW2d 800 (1989); *People v McFadden*, 159 Mich App 796; 407 NW2d 78 (1987). These decisions stem from an earlier Court of Appeals decision, *People v Cotton*, 38 Mich App 763; 197 NW2d 90 (1972). In *Cotton*, the Court of Appeals considered a challenge to a pretrial photographic identification on the basis that the defendant was not represented by counsel. Relying on prior federal and state cases, the Court held that an accused being *held in custody* is entitled to counsel at any photographic identification proceeding. 38 Mich App 768. However, the Court was careful to note that this right normally was limited "to situations where the accused is in custody at the time." *Id.*

Despite its conclusion that the counsel requirement usually was limited to in-custody lineups, the Court refused to "exclude the possibility that under unusual circumstances a suspect may have a right to counsel during a pretrial photographic identification though at the time he is not in custody." *Id.* at 769. It concluded that such "unusual circumstances" were presented in the case before it: Although the defendant was not in custody at the time of the challenged lineup, he previously had been arrested and had been taken into custody. Further, two lineups had been conducted while he was in custody, and he had been given the advice of counsel during those lineups. Finally, his car had been impounded for inspection

conducted precustody photographic identifications are both necessary and desirable and should not be discouraged.

by investigators. Under those circumstances, the
Court determined that the police could not strip
the defendant of his right to counsel by releasing
him from custody just before the photographic
display:

> Turning to the photographic display in the pres-
> ent case, we are of the opinion that this was no
> longer an in-the-field identification. Its purpose
> was to build a case against the defendant by
> eliciting identification evidence, not to extinguish
> a case against an innocent bystander. [*Id.* at 769-
> 770.]

The focus test articulated in *Cotton* has never
been applied by this Court to a precustodial, inves-
tigatory photographic identification. In a nonbind-
ing opinion signed by only two justices, *People v
Kachar,* 400 Mich 78; 252 NW2d 807 (1977),[9] the
focus test from *Cotton* was adopted; however, in
that case, the defendant already had been ar-
rested, bound over for trial, and placed in custody
before the contested lineup. In contrast, defendant
Kurylczyk was not taken into custody before the
photographic array. Although, clearly, he was a
prime suspect, he was not the only suspect. More-
over, at that point no one had made a positive
identification of defendant as the robber.

Defendant Kurylczyk's situation more closely
resembles the situation of the defendant in *People
v Lee,* 391 Mich 618; 218 NW2d 655 (1974). There,
we considered the necessity of counsel at a precus-
todial photographic lineup conducted as part of an
ongoing investigation. The defendant was selected
as the robber from an eight-photograph display
shown to an eyewitness several days after the

---

[9] A majority of the justices participating in a decision must agree to
the reasoning in order for it to become binding precedent. *Negri v
Slotkin,* 397 Mich 105, 109; 244 NW2d 98 (1976).

robbery. Police suspected that Lee was the robber because the clothing he was wearing in a police photograph matched the clothing reported to have been worn by the robber. On appeal, Lee argued that the *Franklin Anderson* requirement of counsel at a photographic lineup attached at the moment that he became the focus of the police investigation. We disagreed. In a unanimous decision, we refused to apply the requirement of counsel to the "pre-custody, pre-questioning, mere suspicion phase that was evidenced here." 391 Mich 625. We reiterated that "[i]t is the fact of custody that requires implementation of the *Franklin Anderson* rule . . . ." *Id.* citing *People v James Anderson,* 391 Mich 419, 422; 216 NW2d 780 (1974). Because Lee had not been detained by the police, we concluded that it simply was "not feasible to require appointment of counsel . . . ." 391 Mich 625.

The facts of *Lee* are similar to the facts in this case. On the basis of various sources of information, defendant Kurylczyk, like defendant Lee, was a primary suspect in a police investigation of a robbery. As in *Lee,* defendant Kurylczyk had not previously been arrested, had not yet been identified by any witness as the robber, and was not the only suspect whom the police were investigating. Although the police had more inculpatory evidence against Kurylczyk at the time of his photographic array than the police in *Lee* had against their suspect, the detectives in this case had not narrowed their investigation only to Kurylczyk. In the photographic array shown to the witnesses, the photograph of another suspect was included in addition to the photograph of defendant Kurylczyk. Moreover, on the very day that defendant was being interviewed, police were called back to the bank to investigate another potential suspect.

Under these circumstances, the appointment of

counsel is neither necessary nor feasible. At the early stage of an investigation of an unsolved crime, investigators cannot predict whether a witness will recognize a particular suspect as the perpetrator of that crime. Thus, it is impossible to know whether a photographic array will help to "build a case against the defendant" or will "extinguish a case against an innocent bystander." *Cotton, supra,* 38 Mich App 769-770. Often, the distinction between those two courses of action is apparent only after an eyewitness has made, or failed to make, an identification. For this reason, we agree with the unanimous decision in *Lee* that counsel is not required at precustodial, investigatory photographic lineups like the one that was used in this case:

> Defense counsel's argument that the right to counsel attaches once "an investigation has focused" on a particular suspect is an inaccurate one, insofar as it is supposed to refer to "precustody" investigations. [391 Mich 625.]

In the case of photographic identifications, the right of counsel attaches with custody.

B

Defendant next argues that the photographic array shown to the witnesses was unduly suggestive violating his right of due process under the Fourteenth Amendment. *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967); *Franklin Anderson, supra* at 169; *Wade, supra,* 388 US 228. In order to sustain a due process challenge, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification. *Neil v Big-*

*gers,* 409 US 188, 196; 93 S Ct 375; 34 L Ed 2d 401 (1972); see also *Lee, supra,* 391 Mich 626. If the trial court finds that the pretrial procedure was impermissibly suggestive, testimony concerning that identification is inadmissible at trial. However, in-court identification by the same witness still may be allowed if an independent basis for in-court identification can be established that is untainted by the suggestive pretrial procedure. *Franklin Anderson, supra,* 389 Mich 168-169.

On review, the trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous. *Id.* at 169; *People v Burrell,* 417 Mich 439, 448; 339 NW2d 403 (1983). Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* at 449.

Defendant Kurylczyk argues that the pretrial photographic array used to identify him was impermissibly suggestive because various characteristics of his photograph caused him to be singled out from the other men. He argues that he is the only man in the photographic array who was dressed in clothing that matches the clothing reported to have been worn by the robber. Particularly obvious in defendant's photograph is a chain attached to his belt and extending to a wallet in the rear pocket of his jeans. None of the others in the photographic lineup wore a trucker's wallet. Moreover, this wallet was plainly visible in the bank's surveillance photographs that were published in the local paper. In addition, defendant complains that his photograph was taken from a closer distance, so that his image appears larger than the others, and the background appears to be a different color. Finally, defendant points out that three of the men in the array have mustaches; defendant does not have a mustache, and none of the

witnesses described the robber as having a mustache. According to defendant, these features created a substantial likelihood of misidentification precluding the admission of any testimony regarding the photographic array. We disagree.

"Generally, the photo spread is not suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification." Sobel, Eyewitness Identification, § 5.3(a), pp 5-9 to 5-10. Thus, differences in the composition of photographs,[10] in the physical characteristics of the individuals photographed,[11] or in the clothing worn by a defendant and the others pictured in a photographic lineup[12] have been

---

[10] See, e.g., *People v Dean,* 103 Mich App 1; 302 NW2d 317 (1981) (the panel refused to find a photographic identification impermissibly suggestive simply because the defendant's photograph was composed vertically while the five other photographs were composed horizontally); *People v Wilson (On Rehearing),* 96 Mich App 792, 799; 293 NW2d 710 (1980) (photographic flaw over the defendant's forehead was not suggestive, in light of the fact that "[a]ll six photographs show evidence of having been handled a great deal"); *People v Thornton,* 62 Mich App 763, 768; 233 NW2d 864 (1975) (the photographic display not suggestive even though six photographs were "full-body length" while the defendant's was a "head and shoulders" shot). See, generally, Sobel, Eyewitness Identification, § 5.3(a), pp 5-16 to 5-18.

[11] See, e.g., *People v Powell,* 97 Mich App 287; 294 NW2d 262 (1980) (the fact that only three of the six photographs depicted a man resembling the description of the five foot, nine inch tall, 269 pound defendant did not render the photographic array impermissibly suggestive); *People v Richmond,* 84 Mich App 178, 181; 269 NW2d 521 (1978) (the photographic display was not impermissibly suggestive, even though the photographs depicted persons with different complexions and facial hair and the pictures were not all the same size); *Futch v State,* 192 Ga App 345; 385 SE2d 18 (1989) (only two of the six photographs depicted mustaches, even though the witness described the robber as having a mustache); *State v Alvarez,* 145 Ariz 370; 701 P2d 1178 (1985) (the defendant was the only individual with facial moles); *Williams v State,* 465 NE2d 1102 (Ind, 1984) (the defendant was the only individual with a visibly scarred face); *State v Ivy,* 558 A2d 209 (RI, 1989) (the inclusion of four men with facial hair did not impermissibly suggest the choice of a clean-shaven defendant).

[12] See, e.g., *People v Hampton,* 52 Mich App 71, 77; 216 NW2d 441

found not to render a lineup impermissibly suggestive.

However, a court will find that a witness' identification of a defendant was the product of an improper photographic identification if differences in the photographs led to a substantial likelihood of misidentification. In such cases, witnesses typically select a defendant on the basis of some external characteristic, rather than on the basis of the defendant's looks. For example, in *Commonwealth v Thornley,* 406 Mass 96; 546 NE2d 350 (1989), the defendant was the only man of thirteen men depicted in a photographic array who was wearing glasses. The court found that the array was impermissibly suggestive because the witnesses admitted selecting the photograph on the basis of the glasses.

Similarly, in *Henry v State,* 519 So 2d 84 (Fla App, 1988), the witness testified that a patch on the defendant's clothing was a factor in his selection of the defendant from the photographic array. The patch, combined with other factors, "created an unnecessarily suggestive identification procedure and so taints the lineup . . . as to give rise to a substantial likelihood of irreparable misidentification." 519 So 2d 86. See also *State v Davis,* 176 W Va 454; 345 SE2d 549 (1986).

(1974), reversed on other grounds 394 Mich 437; 231 NW2d 654 (1975) (the "[d]efendant's reappearance in the photographic display, . . . and his lone hatted picture, when all others were hatless, were not so impermissibly suggestive that a very substantial likelihood of mistaken identification arose"); *Kearney v Maryland,* 567 F Supp 1248 (D Md, 1983) (the fact that the defendant was the only individual pictured in clothes that matched the description of those worn by the robber was not significant because the victim testified that she identified the defendant from his facial features); *United States v Smith,* 602 F2d 834 (CA 8, 1979) (the fact that the defendant was the only one of ten individuals pictured who was wearing bib overalls was not impermissibly suggestive where the failure of several witnesses to identify him contributed to the finding that the array was not unduly suggestive).

In analyzing defendant's claim, we do not question his contention that his photograph stood out from the others in a suggestive fashion. It is obvious from examining the photographs that defendant's photograph was distinct, particularly because he is wearing a trucker's wallet in the photograph. However, a suggestive lineup is not necessarily a constitutionally defective one. Rather, a suggestive lineup is improper only if under the totality of the circumstances there is a substantial likelihood of misidentification. *Lee, supra* at 626. The relevant inquiry, therefore, is not whether the lineup photograph was suggestive, but whether it was unduly suggestive in light of all of the circumstances surrounding the identification.

When examining the totality of the circumstances, courts look at a variety of factors to determine the likelihood of misidentification. Some of the relevant factors were outlined in *Neil v Biggers, supra* at 199-200:

> As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Analyzing the relevant factors in this case, we hold that the trial court did not clearly err when it found that there was no substantial likelihood of misidentification during this photographic array.

First, although neither Ms. Kamendat nor Ms. Dortman saw defendant before the day of the robbery, both had ample opportunity to view the

robber during the offense. Mary Kamendat testi-
fied that she viewed the robber for a period of
three to four minutes, from a distance of as little
as one and one-half feet. She did not lose sight of
the robber, saw both a front and a side view of
him, and watched him as he walked out of the
bank. Cindy Dortman occupied the teller station
next to Mary Kamendat. She testified at the *Wade*
hearing that she also had a good look at the
robber and that she watched him as he left the
building.

Second, both witnesses provided a detailed de-
scription of the robber to the police shortly after
the crime was committed. Ms. Kamendat described
the robber as approximately forty-five or forty-six
years old, almost six feet tall, weighing about 210
pounds, with dust or some other substance on his
face. She also described him as either wearing a
wig or needing a haircut. Cindy Dortman noticed
that the robber was wearing a light-colored shirt, a
baseball cap, dark sunglasses, and had longer hair
than normal for a man of his age. She also de-
scribed him as wearing flared jeans, with a chain
hanging out of his pocket and his shirt pulled over
his pants. She noted that the robber had a "long,
very distinguished" nose. These descriptions com-
port with the image of the robber as seen in the
surveillance photographs, and with the image of
defendant as he appears in the photographic ar-
ray.

Third, both Kamendat and Dortman testified
that they were certain that defendant was the
robber.

Fourth, the photographic array was conducted
within two weeks of the bank robbery. Courts have
held that delays as long as eighteen months after
a crime do not invalidate an eyewitness identifica-

tion.[13] The relatively short span of time between the robbery and the lineup in this case does not reduce the reliability of the lineup identifications.

Finally, there is no evidence that the tellers were panicked or otherwise psychologically debilitated by the crime. Carolyn Schultz, branch manager of the bank, testified that the tellers were trained to react in this type of situation and that they did react calmly to the robbery:

> They have a description sheet that they have to write down what they remember and they did not talk to one another before they did this. They wrote down anything they could remember about the suspect and remained very quite [sic: quiet] and very calm until the police got there.

One factor that tends to undermine the reliability of the photographic array identification is the misidentification several days after the robbery of a bank customer as the robber. As already noted, for a brief period, Dortman and Kamendat thought the robber had returned to the bank. However, the record indicates that, at most, their identification of the customer as the robber was tentative. Neither Kamendat nor Dortman ever positively identified this customer as the man who robbed the bank. Rather, Kamendat testified that she was caught off guard and overreacted when she saw a man who appeared to be the size of the robber, and who was dressed like the robber, with a chain on his belt that reached into a bag. However, after reviewing the incident in her mind later that day, she came to the conclusion that the customer was not the robber. At trial she testified that she never

---

[13] See, e.g., *State v Fenn,* 16 Conn App 318; 547 A2d 576 (1988) (a two-week delay did not render identification unreliable); *State v Stewart,* 389 So 2d 1321 (La, 1980) (a thirteen-month delay did not invalidate identification); *People v Holmes,* 141 Ill 2d 204; 152 Ill Dec 268; 565 NE2d 950 (1990) (an eighteen-month delay was relevant only to the weight to be given the identification).

told investigators that he was the robber—[14] only that she and the other tellers felt "he looked alike [sic: a lot] like him, it would be worth looking into."

Dortman testified that she told a deputy that the customer was the same size as the robber and had other similarities to the robber, including the chain hanging out of his pocket. Her primary concern, however, was that this customer's transaction involved the exchange of Canadian currency.

Where there are other indicia of reliability, an initial inability to identify the defendant or a tentative false identification of another person will not invalidate a witness' identification of the defendant. See *Carter, supra,* 415 Mich 600; *People v Pennington,* 113 Mich App 688, 694; 318 NW2d 542 (1982); *United States v Briggs,* 700 F2d 408, 413 (CA 7, 1983), cert den 462 US 1110 (1983); *Clements v State,* 521 So 2d 1378 (Ala Crim App, 1988). In this case, the opportunities afforded these witnesses to view the perpetrator, the accuracy of their descriptions of the robber, and the confidence with which they identified defendant as the robber provided sufficient indicia of reliability to allow submission of the evidence to the jury.

It is also argued that the identification at the photographic lineup of defendant by the five eyewitnesses was improperly influenced by the publication in the local newspaper of the surveillance photographs. Generally, the use of such surveillance photographs to identify a subject is not impermissibly suggestive, "since such films provide a memory-refreshing device, showing 'the man who actually committed the robbery' as opposed to the picture of 'some possible suspect in the police

---

[14] This testimony is contradicted by that of Cindy Dortman, who testified that Mary Kamendat said, "that's him, that's the robber."

files.' " Sobel, *supra,* § 5.3(g), p 5-44. However, in this case, Kamendat did not remember seeing the chain attached to the trucker's wallet during the robbery. She saw it for the first time in the surveillance photographs. Thus, the appearance of the surveillance photographs served not only to refresh her memory of the robbery, but to enhance it. More important, when Kamendat earlier misidentified a bank customer as the robber, her mistake was based primarily on the fact that the customer wore a trucker's wallet. Likewise, Dortman also saw the surveillance photographs in which the robber's trucker's wallet was plainly visible.

Despite the potential suggestive influence of the surveillance photographs, as well as the suggestiveness of the defendant's lineup photograph, we conclude that defendant has not demonstrated clear error by the trial court. Nothing in the record supports a conclusion that there was a substantial likelihood of misidentification at the photographic array as a result of any suggestive influences. For example, there is no testimony by either teller that her identification of defendant's photograph was made on the basis of her examination of the surveillance photographs. In fact, each witness testified that the photographs had no effect on her ability to identify defendant as the robber.

Just as important, in contrast to the cases cited earlier, no testimony was elicited from the witnesses indicating that they chose defendant's photograph because of the suggestive features of his photograph. See *Commonwealth v Thornley* and *Henry v State, supra.* Instead, the record contains the sworn testimony of two trained bank tellers who stated that they were certain that they recognized defendant as the man who robbed the bank. Surely this testimony, along with the other factors

noted above, permitted the trial court to conclude
that the tellers would have recognized defendant
as the robber, regardless of the suggestive features
of his photograph or the publication of the surveil-
lance photographs. Therefore, the identification
testimony of the tellers regarding the photo-
graphic array was properly admitted as evidence
at trial. Because the photographic array was not
impermissibly suggestive, it did not taint the sub-
sequent in-court identifications by the tellers.

### III

Defendant also argues that the corporeal lineup
was impermissibly suggestive because he was sin-
gled out from the other participants by his appear-
ance. As earlier noted, five eyewitnesses viewed
the corporeal lineup—Mary Kamendat, Cindy
Dortman, Shirley Smith, Gladys Caris, and Caro-
lyn Schultz. Each identified defendant as the bank
robber. The participants in this lineup wore simi-
lar attire—jail greens and short-sleeved shirts.
Defendant complains that he appeared more di-
sheveled than the others because he had been
wearing the same clothing for several days in jail
and because he had not been allowed to shave
while in jail. In addition, he challenges the lineup
because three of the participants had mustaches,
despite the fact that none of the witnesses de-
scribed the bank robber as having a mustache. He
also argues that it was improper that only three of
the lineup participants (including defendant) had
appeared in the photographic array. Finally, he
argues that the lineup was tainted by the publica-
tion of the surveillance and postarraignment pho-
tographs in a local newspaper.

Like a photographic lineup, the suggestiveness
of a corporeal lineup must be examined in light of

the totality of the circumstances. *Stovall, supra* at 302. As a general rule, "physical differences between a suspect and other lineup participants do not, in and of themselves, constitute impermissible suggestiveness . . . ." *People v Benson,* 180 Mich App 433, 438; 447 NW2d 755 (1989), rev'd in part on other grounds 434 Mich 903 (1990). Differences among participants in a lineup

> are significant only to the extent they are apparent to the witness and substantially distinguish defendant from the other participants in the lineup. . . . It is then that there exists a substantial likelihood that the differences among line-up participants, rather than recognition of defendant, was the basis of the witness' identification. [*People v James,* 184 Mich App 457, 466; 458 NW2d 911 (1990), vacated on other grounds 437 Mich 988; 469 NW2d 294 (1991).]

Thus, in *People v Holmes,* 132 Mich App 730, 746; 349 NW2d 230 (1984), where the defendant was the second tallest participant in the lineup and heavier than others, the lineup was not impermissibly suggestive because the defendant's appearance was substantially similar to that of the other participants. In *People v Horton,* 98 Mich App 62, 67-68; 296 NW2d 184 (1980), the lineup was not impermissibly suggestive despite alleged age and height differences between the defendant and the other participants and despite the fact that the defendant was the only participant with a visibly scarred face. A lineup in which the defendant was the only participant with both a mustache and a goatee was found to be not impermissibly suggestive in *People v Hughes,* 24 Mich App 223; 180 NW2d 66 (1970).[15]

---

[15] For a description of a number of cases in which such differences did not render the lineup overly suggestive, see Sobel, *supra,* § 3.5(b), pp 3-46 to 3-50.

Like the viewing of surveillance photographs, the publication of photographs of a defendant does not taint a subsequent lineup where the witness' identification is not unduly influenced by the published photographs. See *People v Barnett*, 163 Mich App 331; 414 NW2d 378 (1987); *People v Prast (On Rehearing)*, 114 Mich App 469; 319 NW2d 627 (1982).[16]

Upon review of the record, we conclude that the trial court did not err when it found that testimony regarding the identifications made by Mary Kamendat, Cindy Dortman, Shirley Smith, and Gladys Caris was admissible. A photograph of the corporeal lineup shows six men of approximately the same age, height, and weight. None of the men stands out from the others in an impermissibly suggestive fashion. Moreover, according to their written notes at the lineup, none of these four witnesses chose defendant because she saw the surveillance or postarraignment photographs that were published in the newspaper or because of his disheveled appearance.

Mary Kamendat wrote that defendant was the "[s]ame size, height. Looks like the man from what I remember. Stands like him." Cindy Dortman based her selection of defendant on other factors: "[N]ose size appears large, pointed. Shape of face

---

[16] See also *Mikel v Thieret*, 887 F2d 733, 738-739 (CA 7, 1989) (the appearance of the defendant's photograph in a newspaper five days before a witness selected him from a photographic array was not impermissibly suggestive, where the witness had an adequate opportunity to view his attacker and "the witness accurately described his attacker, took very little time to identify him from the photo array, and was asked to identify him only eleven days after the crime"); *United States v Elliott*, 915 F2d 1455, 1457 (CA 10, 1990) (a bank teller was allowed to identify a defendant, even though she had seen a fifteen-year-old photograph of him in the newspaper shortly before selecting him from a photographic array, where she stated that the photograph did not influence her selection and that the photograph "did *not*, in many ways, really resemble the person who had robbed the bank").

from side view, height about the same, about six foot. Stomach same size. I put beer belly type." In describing her reasons for selecting defendant, Gladys Caris wrote: "[T]he hair length was the same, he's barreled chested, height, his body build and his facial features . . . those were the items that I felt were the same as the bank robber." Shirley Smith wrote that defendant "looked like the same man, same weight, facial hair. Side profile looked very much like I remember from the day of the robbery. You know when you've seen someone before. None of the others were even close. With the hat and sunglasses on he looked like an exact match."

Nothing in the record demonstrates a clear error by the trial court when it concluded that the corporeal lineup was not impermissibly suggestive to these four witnesses. Thus, their testimony regarding the corporeal lineup was properly admitted.

IV

The identification testimony of branch manager Schultz requires a separate analysis. Defendant argues, relying on *People v Prast, supra,* that her lineup and in-court identifications were improperly admitted because they were premised upon her viewing of the bank's surveillance photographs, rather than upon her observation of the crime. The prosecution agrees on appeal that her testimony should have been disregarded for this reason.

On the other hand, the trial court found that the surveillance photographs were not "unduly influential" in her selection of the defendant. The record reveals that Schultz viewed prints from the surveillance film as well as the surveillance and

postarraignment photographs published in the newspaper. Although she testified at the *Wade* hearing that her identification of defendant was not premised upon her viewing of the newspaper photographs, she stated that "because I did not get a clear view of him, I identified him from the picture my camera took."

It is not clear from the record whether the surveillance photographs were shown to Mrs. Schultz by law enforcement personnel. Although government conduct in the display of such photographs may be a factor in determining whether due process protection has been violated, see *United States v Stubblefield,* 621 F2d 980, 983 (CA 9, 1980); *Commonwealth v Otsuki,* 411 Mass 218, 235; 581 NE2d 999 (1991), we do not explore that issue because we determine that the error, if any, with respect to the identification of defendant by Schultz was harmless beyond a reasonable doubt.

MCR 2.613(A) provides that an error in the admission of evidence will not be grounds for setting aside a verdict "unless refusal to take this action appears to the court inconsistent with substantial justice." See also MCL 769.26; MSA 28.1096. Accordingly, when testimony is erroneously admitted, we must determine the probable effect of that testimony on the " 'minds of an average jury.' " *People v Banks,* 438 Mich 408, 430; 475 NW2d 769 (1991), quoting *Schneble v Florida,* 405 US 427, 432; 92 S Ct 1056; 31 L Ed 2d 340 (1972). Reversal is required if the minds of an average jury would have found the prosecution's case " 'significantly less persuasive' " without the erroneously admitted testimony. *Banks,* 438 Mich 430. However, if it can be shown beyond a reasonable doubt that the testimony did not affect the jury's verdict, then the erroneous admission of the

testimony is considered to be harmless. *People v Robinson,* 386 Mich 551, 563; 194 NW2d 709 (1972); *People v Watkins,* 438 Mich 627, 667; 475 NW2d 727 (1991); *Franklin Anderson,* 389 Mich 169.

Our review of the record in this case demonstrates that the persuasiveness of the prosecutor's case was unaffected by Schultz' testimony. The jury heard the testimony of four other eyewitnesses who identified defendant as the robber both before trial and in court. Carolyn Schultz was the least important witness for the prosecution's case. She observed the robber only from a distance, and only for a few moments. At most, her identification testimony was cumulative of more compelling eyewitness testimony.

More important, any defects in the eyewitness identifications were brought out by defendant's counsel. He vigorously cross-examined the witnesses and attacked their credibility. In addition, he presented the testimony of Harvey Schulmann, Ph.D., a psychologist who specializes in human memory, attention, and perception, to discredit the reliability of eyewitness identifications. Dr. Schulmann claimed that between twenty and fifty percent of all eyewitness identifications are incorrect, and that a number of factors, such as the passage of time, poor viewing conditions, and age of the witness, may increase the error rate. He also testified that the confidence of an eyewitness bears no relationship to the accuracy of an identification. In light of the jury's decision to convict despite the vigorous defense presented by defendant, we conclude that the exclusion of identification testimony of relative unimportance would have had no effect on the jury's verdict.

Our conclusion of harmless error is strongly supported by evidence presented that did not relate to identification. For example, defendant offered the testimony of three alibi witnesses who stated that he was with them at the time of the robbery; however, the alibi was weakened by the admission that he originally lied to investigators concerning his whereabouts at the time of the robbery.

Similarly, defendant's testimony regarding his car was suspect. Evidence was presented that defendant owned a car virtually identical to the car described by the eyewitnesses as the robber's car. Defendant admitted that he stopped driving his car shortly after the robbery. He claimed that the car was malfunctioning, but evidence at trial showed that defendant's car had no mechanical problems. In addition, evidence was presented that the license plate on defendant's car was on a hinge which allowed the plate to be lifted up when filling the gas tank. Defendant's license plate would stick in this position, just as the robber's license plate was stuck in this position during the robbery.

Finally, the jury was allowed to examine various pieces of physical evidence—the bank's surveillance photographs, the photograph of defendant that appeared in the photographic array, and the defendant's clothing, which the state alleged he wore during the robbery.

This untainted evidence is sufficient to support a finding beyond a reasonable doubt that the jury's verdict was not affected by admission of the identification testimony of Carolyn Schultz. The prosecutor's case would have been equally persuasive with or without this testimony. For this reason, any error was harmless.

V

In conclusion, we hold that the trial court did

not err in denying defendant's motion to exclude evidence of the photographic and corporeal lineup identifications. We also hold that any error in the identification testimony of Carolyn Schultz was harmless beyond a reasonable doubt. The judgment of the Court of Appeals is affirmed.

MALLETT, J., concurred with GRIFFIN, J.

BOYLE, J. (*concurring in part and dissenting in part*). I concur in all but part IV of Justice Griffin's opinion.

The admission of the testimony of branch manager Schultz does not rise to the level of a cognizable claim of denial of due process. First, defendant has, minimally, the burden of coming forward on this issue, and there is no record basis indicating impermissible police conduct. *Commonwealth v Otsuki,* 411 Mass 218, 233; 581 NE2d 999 (1991). Defendant contends that the witness' statement implies that she was shown photographs. However, the witness merely stated, "I identified [the defendant] from the picture my camera took." *Ante* at 315.

Second, even assuming that law enforcement officials showed Mrs. Schultz the picture that "her camera took," due process would be offended only if the police had done something that "was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification," *ante* at 302, citing *Neil v Biggers,* 409 US 188, 196; 93 S Ct 375; 34 L Ed 2d 401 (1972). Unlike situations where the police are alleged to have manipulated a photographic display or photo opportunity to persuade the witness to misidentify a targeted subject, in the instant case, there is no record basis indicating "pressure on the witness to acquiesce" in the identification of

the defendant. *Manson v Brathwaite,* 432 US 98, 116; 97 S Ct 2243; 53 L Ed 2d 140 (1977). The surveillance photograph was of the actual perpetrator. "Little possibility of misidentification arises from the use of photographs depicting 'the likeness not of some possible suspect in the police files, but of the [person] who actually committed the robbery.' " *United States v Stubblefield,* 621 F2d 980, 983 (CA 9, 1980). The identification by the witness was based on her appraisal of the defendant's resemblance to the surveillance photograph image of the true perpetrator. Thus, the risk that Mrs. Schultz would misidentify the defendant was no greater than the risk that the jurors, comparing the defendant with the same surveillance photographs, would misidentify the defendant.

While the foundation for Mrs. Schultz' testimony may have been deficient in that it was not based on an actual observation of the robber, no lack-of-foundation objection was made in the trial court. Further review is unnecessary.

RILEY, J., concurred with BOYLE, J.

BRICKLEY, J. (*concurring in part and dissenting in part*). While I agree with the lead opinion that the decision of the Court of Appeals should be affirmed, I write separately to express my disagreement with the lead opinion's affirmance of the lower courts' findings that the photographic lineup was not impermissibly suggestive.

This Court has recognized both "[t]he scientifically and judicially recognized fact that there are serious limitations on the reliability of eyewitnesses identification of defendants . . . ." *People v Franklin Anderson,* 389 Mich 155, 172; 205 NW2d 461 (1973). The United States Supreme Court has also recognized the dangers inherent in

eyewitness identification evidence. In *United States v Wade,* 388 US 218, 228; 87 S Ct 1926; 18 L Ed 2d 1149 (1967), the majority noted:

> [T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.

One commentator has noted:

> Scientific evidence concerning the unreliability of eyewitness identification has continued to mount since the *Wade* trilogy. Contrary to popular understanding, our eyes and memories do not operate like a camera on which events are accurately recorded subject to retrieval at any time, but in fact memory can be altered to a significant extent by information perceived after the fact. Also, through a process known as "unconscious transference," a person seen briefly in one context may be erroneously "recognized" in another time and place. Thus, a crime victim may select someone from a lineup because he or she has seen that person in . . . a previous photo lineup, rather than at the scene of the crime. Despite such dangers, however, juries find eyewitness testimony to be highly persuasive. [Sobel, Eyewitness Identification, § 1.1, pp 1-2 to 1-3.]

It is important to keep in mind the widely acknowledged dangers inherent in identification procedures. Witnesses are capable of making mistaken identifications, but yet may be certain that they have correctly selected the perpetrator of the crime. Because of the possibility of such errors,

law enforcement agencies and courts must carefully guard against creating situations in which there is a high likelihood that witnesses will be led to identify an innocent person as being a perpetrator of a crime. Furthermore, they must guard against the danger that, once a witness has identified a person depicted in a photograph as the perpetrator of a crime, they may be likely to base later identifications of the suspect upon that photograph, rather than on their recollection of the crime.

In determining whether pretrial photographic arrays violate the constitutional rights of the accused, courts must determine whether the array creates a substantial likelihood of irreparable misidentification. *Simmons v United States,* 390 US 377, 383; 88 S Ct 967; 19 L Ed 2d 1247 (1968); *Neil v Biggers,* 409 US 188, 196; 93 S Ct 375; 34 L Ed 2d 401 (1972), *Anderson, supra,* p 169. In this case, tellers Mary Kamendat and Cindy Dortman were presented with a photographic array containing six pictures. All the photographs showed men wearing short-sleeved shirts and baseball hats, all wore sunglasses and all were potbellied. In addition, all were positioned against similar backgrounds and all pictures were cropped to roughly the same size. However, the image of the defendant appears larger than the images of the other subjects, and the background in the picture is a slightly different color. He is standing at a different angle than the others. In addition, three of the other subjects had mustaches. Finally, and perhaps most noteworthy, the defendant's picture clearly reveals that he has a "trucker's wallet" in his back pocket that is attached to his belt with a chain. No such wallet appears in the photographs of the other subjects.

The general consensus among the eyewitnesses

was that the suspect was about six feet tall with a
potbelly, wearing a short-sleeved shirt, a baseball
cap, sunglasses and a chain wallet on his belt. He
was not described as having facial hair. In this
photographic array, only one subject met this
description: defendant Kurylczyk.[1] Furthermore, as
the lead opinion notes, the chain wallet worn by
the robber is prominently visible in the surveil-
lance photographs of the robbery. Both Kamendat
and Dortman testified to having seen the surveil-
lance photograph in the paper. Thus, this feature
was reëmphasized for them. Most certainly, the
chain wallet was an important facet of the rob-
ber's appearance. Along with the other features
that distinguished the defendant's photograph, I
think that the fact that he was the only one that
was obviously wearing such a wallet makes this
array impermissibly suggestive. I think there is no
doubt that this lineup was suggestive, and that it
suggested to the witnesses that the defendant was
the perpetrator.

The lead opinion states that in order to find that
a lineup is *unduly* suggestive, however, a court
must determine whether the *Neil v Biggers* crite-
ria are satisfied. *Ante,* p 306. I do not agree that
these criteria indicate that there was no substan-
tial likelihood of misidentification.[2] Although the
lighting in the bank was good, the robbery only

[1] The United States Court of Appeals for the Second Circuit has
noted that, in order to be constitutionally valid, "[t]he array must not
be so limited that the defendant is the only one to match the
witness's description of the perpetrator." *United States v Maldonado-
Rivera,* 922 F2d 934, 974 (CA 2, 1990).

[2] In addition, I question how helpful some of these criteria actually
are in determining whether an identification is reliable. Although the
lead opinion finds support in the fact that both witnesses testified that
they were certain that the defendant was the robber, some studies
have indicated that there is little correlation between the confidence
that witnesses express in their certainty and the accuracy of their
observations. See Zalman & Siegel, *The psychology of perception,
eyewitness identification, and the lineup,* 27 Crim L Bull 159 (1991).

lasted three to four minutes. Neither of the two tellers were looking at the robber for the entire duration of the robbery. Further, the evidence showed that Dortman only observed the robber for approximately one minute.[3] In addition, another factor undermines the reliability of their identification. As the lead opinion notes, some of the employees had identified another person as the robber. One of these employees was Kamendat, the witness who was directly confronted by the robber, and thus had the best view of him. In explanation of this event, she testified that she thought that this other person was the robber in part *because he was wearing a chain on his belt. Ante,* p 308. The fact that the best witness identified another person as the robber, in part on the basis of the fact that he was wearing a chain wallet shows how important this feature was to the identification of the suspect.

Although I acknowledge that it is rare for courts to find photographic arrays impermissibly suggestive, some examples are in accord with the conclusion I reach here. In *Commonwealth v Thornley,* 406 Mass 96, 97, 99-100; 546 NE2d 350 (1989), the Supreme Judicial Court of Massachusetts found a photographic array impermissibly suggestive. The array consisted of photographs of thirteen men, with only the defendant wearing glasses. Both witnesses had originally described the perpetrator as wearing glasses, and stated that they chose the defendant because of his glasses. In *State v Iron Thunder,* 272 NW2d 299 (SD, 1978), the victim

---

[3] In addition, some studies support the conclusion that the fact that the robber was carrying a gun makes it less likely that the witnesses were focused on the robber's face for the entire duration of the robbery. Experimental data has shown that in situations in which a weapon was visible, subjects called upon to describe the facial features of the carrier were much less able to do so than in situations where a weapon was hidden. See Kramer, *Weapon focus, arousal, and eyewitness memory,* 14 Law & Human Behavior 167 (1990).

described the perpetrator as having a big belly. She was presented with a photographic array that included five photographs of other subjects, and two photographs of the defendant, one showing only his bare chest and stomach, and another picture of his face and shirt open at the collar. Furthermore, the five other subjects had identification boards around their necks. The court found that this was impermissibly suggestive. *Id.,* p 301.[4] See also *Butler v State,* 544 So 2d 1115 (Fla App, 1989) (a photographic array was found to have been impermissibly suggestive because only the defendant wore the distinctive clothing described by witnesses, the picture had a different background, and the police required one of the witnesses to narrow her two choices to one); *People v Shea,* 54 AD2d 722; 387 NYS2d 477 (1976) (a photographic array was found to have been impermissibly suggestive because the defendant's picture was in color and was smaller in size than the others, the defendant's picture appeared more than once, and he was the only one depicted as possessing the identifying characteristic of a blond afro).

I acknowledge that it appears that these cases are distinguishable because the witnesses chose each of the photographs in question on the basis of the characteristic that distinguished it from the other photographs. However, although these two witnesses did not testify that they based their identification of the defendant's photograph on the chain wallet that he wore, it was clearly an important part of his appearance. It was a part of the original description by Cindy Dortman. In addition, as I noted above, when Mary Kamendat mistakenly identified the bank customer as the

---

[4] The court went on to find that the identification had an independent basis. *Id.,* p 302.

robber, she testified that she did so in part because he, too, wore a chain wallet.

Given the suggestiveness of the photographic array and the lack of reliability of the identifications under the totality of the circumstances, I would hold that this photographic array was impermissibly suggestive. Thus, I believe that the trial court erred in allowing Kamendat and Dortman to testify regarding their identification of the defendant's photograph in the array.

Although I find this lineup to be impermissibly suggestive, I would not reach the issue whether the exposure of Kamendat and Dortman to this lineup tainted their subsequent identifications. Even if it did, I find the error to be harmless in light of the other evidence against the defendant, including the identifications made by witnesses Shirley Smith and Gladys Caris. I agree with the lead opinion that the corporeal lineup is not constitutionally impermissible, and I agree that the exposure of the witnesses to the surveillance photograph of the robber and postarraignment photograph of the defendant did not violate the defendant's constitutional rights. Thus, I concur with the lead opinion's result.

CAVANAGH, C.J., and LEVIN, J., concurred with BRICKLEY, J.