# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

UNPUBLISHED
September 10, 2015

v

No. 321519
Wayne Circuit Court
LC No. 14-000470-FH

JESSIE WILLIE GREEN,

     Defendant-Appellant.

Before: TALBOT, P.J., and WILDER and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of unlawful imprisonment, MCL 750.349b, attempted assault by strangulation, MCL 750.84(1)(b); MCL 750.92, felonious assault, MCL 750.82, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to 7 to 15 years' imprisonment for the unlawful imprisonment conviction, three to five years' imprisonment for the attempted assault by strangulation conviction, two to four years' imprisonment for the felonious assault conviction, and two years' imprisonment for the felony-firearm conviction. We affirm.

This case arises from the assault of Symphony Whitney on December 19, 2013, in Detroit, Michigan. Whitney, who was 16 years old at the time of the assault, was walking to school between 8:00 a.m. and 8:30 a.m. As she walked along the sidewalk, she approached a vacant house. A green van was parked in the driveway of the house and partially on the sidewalk, forcing Whitney to walk around the vehicle. The van's passenger side was closest to Whitney as she approached the vehicle.

Whitney walked around the front of the van and immediately saw defendant kneeling down by the driver's side door. He was dressed all in black and wore a ski mask, although he had pulled the mask up so that it only covered his forehead. Whitney only saw defendant's face "[f]or a short moment" before he pulled the mask down over his face, jumped to his feet, and grabbed her. Whitney fell in the snow and began screaming. Defendant pulled her up by the neck, then put her in a chokehold with his right arm. Whitney continued to scream and struggle to escape. Defendant's right arm was across Whitney's neck, but she was able to breathe and

-1-

scream for help. She was not, however, able to get away or remove his arm. While Whitney testified that defendant did not pull her toward the van, testimony from two other witnesses admitted at defendant's trial established that defendant pulled her toward the vehicle.[1]

With his right arm still around Whitney's neck, defendant pulled out a black gun with his left hand and pointed it at her and menacingly told her to shut up. Whitney continued to scream. A white work van passed the two as they struggled, then the driver, Calvin White, stopped, backed the vehicle up, and got out of the van. Earl Jackson, who was visiting at the house across the street, heard the commotion, looked out the window, and saw a man in black with a ski mask struggling with Whitney. Jackson ran outside with his weapon drawn.

Whitney removed from her pocket the mace she usually carried when she walked to school, eventually sprayed it at defendant while they struggled, and managed to break free and run toward Wright's work van. Jackson saw defendant run away. Neither Wright nor Jackson saw a gun in defendant's possession.

Wright let Whitney sit inside his van while he tried to see which way defendant had run. Whitney called her father, and a woman who had emerged from another nearby house called 911. Jackson approached the green van and took the keys out of the ignition. Detroit Police officers arrived a few minutes later. When Whitney's father arrived at the scene, she told him that her neck hurt.

Detroit Police Officer Charles Howard was working an undercover surveillance detail on a breaking-and-entering task force that morning. He responded to the dispatch call reporting an attempted abduction. Detroit Police officers who were already at the scene ran the green van's license plate through the Law Enforcement Information Network (LEIN), which revealed defendant's name and an address in Harper Woods. Officer Howard drove to the Harper Woods address in his unmarked police car, arriving there shortly after 9:00 a.m.. Officer Howard saw a black Ford and a blue Buick in the driveway. The Ford was registered to Henrietta Barber at an address on Farmbrook Street, and the Buick was registered to defendant and Velvatine Jones at an address on Nottingham Road in Detroit. The Farmbrook address was approximately eight blocks away from the scene of the assault on Whitney.

About 30 minutes after Officer Howard arrived at the Harper Woods address, he saw a woman drive the Ford out of the driveway. The Ford circled the block a couple of times. About1ten minutes later, he saw a man drive the Buick out of the driveway. Both vehicles proceeded to the Farmbrook address and Officer Howard also went to that location.

Officer Howard maintained surveillance at the Farmbrook address for approximately 30 minutes before defendant came out of the house with his girlfriend, Vernell Fleming. Defendant

---

[1] In addition, the prosecutor argued during the closing argument that a surveillance video showed that Whitney was "dragged towards that van[,]" but the video is not contained in the record on appeal.

and Fleming got into the Buick and drove away. Defendant was driving. Officer Howard radioed for assistance, and a waiting marked car stopped defendant.

Detroit Police Officer Jeremiah Orvelo was in the marked car that stopped defendant. During the stop, Officer Orvelo's partner recovered a handgun from defendant's side of the Buick. Defendant carried a valid Carry Pistol License (CPL), but the officers confiscated the weapon for safekeeping. Officer Orvelo did not arrest defendant because Detroit Police Sergeant Jose Ortiz told the officers to ask defendant to come to the police station for questioning.

Later that day, Detroit Police Officer Jeffery Manson assembled a photographic lineup for Whitney to identify her attacker. Officer Manson placed defendant's driver's license picture, which he had obtained from LEIN, in the sixth position in the lineup. The picture on defendant's driver's license was three years old at the time. Officer Manson took the other five pictures from the Michigan Sex Offenders Registry because the backgrounds of the pictures were similar to the background of defendant's driver's license picture.

Whitney, meanwhile, came to the police station to meet with a composite sketch artist. While there, she described her attacker as being around 6 feet tall, skinny, brown-skinned with a medium complexion, and about 30 years old. When the sketch was complete, she asked the artist to add in a beard to more accurately reflect her attacker's appearance.

After Whitney's meeting with the sketch artist, Sergeant Ortiz showed her the photographic lineup. Whitney said that the man in the fourth position looked familiar, but that she was not sure he was the man who attacked her. Unbeknownst to Whitney, the man in the fourth position had been incarcerated at the time of the assault.

Later that same day, defendant arrived at the police station for an interview. Sergeant Ortiz interviewed him and noted that defendant looked different and younger in his driver's license picture than in person. Sergeant Ortiz took a picture of defendant with his cell phone and sent the picture to Officer Manson for inclusion in a second photographic lineup. During the interview, defendant stated that he had inadvertently left the keys in the green van that morning, and that he had last seen the van in the driveway of the Harper Woods address. Defendant maintained that Fleming had been with him all morning and that they had driven together in the Buick to the Nottingham address, then to the Farmbrook address.

On December 20, 2013, Officer Manson went to Whitney's house with the second photographic lineup. He had replaced the other five photographs with photographs of individuals who more closely reflected defendant's different appearance in the new picture that Sergeant Ortiz had taken. He believed that it would have been unduly suggestive to have used the same pictures from the first lineup given that they did not look like the new picture of defendant. Defendant's new picture was now in the fourth position. Whitney only looked at the photographs for "a matter of seconds" and, when asked, indicated that she recognized number four. Whitney wrote, "I think he's the one who attacked me," and, "He tried to kidnap me," on the photographic lineup.

Later that day, Officer Manson called defendant to tell him that he could pick up his green van at the police station. Officer Manson arrested defendant when he arrived. Detroit

Police officers never recovered defendant's gun, however, because defendant had reclaimed it the previous day and because it was not on his person when Officer Manson arrested him.

On February 25, 2014, defendant filed a motion to suppress the identification. Defendant contended that the second photographic lineup was "unnecessarily suggestive and conducive to irreparable misidentification" because Whitney had already selected a suspect in the first lineup and because Officer Manson had removed that suspect's picture from the second lineup and put defendant's new picture in the same position.

The trial court held a *Wade*[2] hearing on defendant's motion to suppress on March 18, 2014, and defense counsel argued consistently with the motion. Both Sergeant Ortiz and Officer Manson testified. Sergeant Ortiz testified that he told Officer Manson that Whitney had tentatively identified number four, but that she was not sure. He also reiterated that defendant looked different and older during his interview on December 19, 2013. Sergeant Ortiz testified that, if he had prepared the second lineup, he would probably have had "some other pictures" in it and he would "[n]ot necessarily" have removed the picture that Whitney had tentatively identified.

Officer Manson testified that he selected pictures for the first lineup based on "similarities and their closeness in age" to defendant. He also stated that Sergeant Ortiz told him that Whitney was unsure about the first lineup and that "[s]he wasn't able to select anyone." Sergeant Ortiz did not tell him that Whitney had tentatively identified the suspect in the fourth position. Officer Manson further testified that he had not seen the composite sketch or Sergeant Ortiz's written notes on the first photographic lineup when he prepared the second lineup. Finally, he testified that he randomly placed defendant's new picture in the fourth position in the second lineup because he did not want to put defendant's picture in the sixth position again. According to Officer Manson, he would have replaced all of the pictures from the first lineup even if he had known that Whitney had tentatively identified the suspect in the first lineup's fourth position.

After testimony from Sergeant Ortiz and Officer Manson, the trial judge remarked that "this identification process was bungled on many levels." The judge opined, however, that the errors did not rise to an unconstitutionally suggestive level and that defense counsel could adequately address the identification problems through cross-examination and argument. The judge said that he was "a little concerned" about the placement of defendant's picture in the fourth position of the second lineup, but he discerned no other possible suggestiveness. Finding no basis to suppress the identification in the second lineup, the trial court denied defendant's motion. The trial court also pointed out to defense counsel that evidence of the misidentification would be admitted at trial.

Both the prosecutor and defense counsel elicited testimony at defendant's jury trial regarding the photographic lineups. Whitney testified that defendant's face looked "fatter" in the first picture and that the first picture did not include some of the features she had pointed out to

---

[2] *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

the sketch artist. She further testified that the second picture looked more like "how [she] described it when [she] got the picture drew," including lines around defendant's nose and mouth. Officer Manson testified that defendant's facial hair was different in the two pictures. Defendant was thereafter convicted and sentenced as described above.

Defendant first contends that the prosecution failed to present sufficient evidence at trial to support his unlawful imprisonment and attempted assault by strangulation convictions. We disagree.

We review de novo a challenge to the sufficiency of the evidence in a jury trial, viewing the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the prosecution proved beyond a reasonable doubt the essential elements of the crime. *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014). Moreover, we will not interfere with the fact-finder's role of determining the weight of evidence or the credibility of witnesses. *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012).

In order to prove unlawful imprisonment, the prosecution must prove beyond a reasonable doubt that the defendant knowingly restrained another person (1) by means of a weapon or dangerous instrument, (2) by secretly confining the person, or (3) to facilitate either the commission of another felony or flight after the commission of another felony. MCL 750.349b; *People v Bosca*, ___ Mich App ___, ___; ___ NW2d ___ (2015); slip op at 7. "The term 'restrain' is defined within the statute as 'to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority.' " *Bosca*, ___ Mich App at ___; slip op at 7, quoting MCL 750.319b(3)(a). The restraint may be temporary, *Bosca*, ___ Mich App at ___; slip op at 7, and unlawful imprisonment "can occur when the victim is held for even a moment," *People v Chelmicki*, 305 Mich App 58, 70; 850 NW2d 612 (2014).

Defendant restrained Whitney by grabbing her and causing her to fall into the snow, pulling her up by her neck, putting her in a chokehold, and trying to drag her to his waiting van. Defendant's actions restricted Whitney's movements, and Whitney's screams and struggles indicated that she did not consent to the actions and that defendant did not have lawful authority to perform them. See MCL 750.319b(3)(a); *Bosca*, ___ Mich App at ___; slip op at 7. The record further indicated that defendant acted in a knowing manner; indeed, his actions appeared quite intentional. See MCL 750.349b(1). Regarding the second element, Whitney testified that defendant held a black gun to her head while he kept her in a chokehold. Thus, defendant restrained Whitney by means of a weapon, one of the three alternative circumstances detailed in the statute. See MCL 750.349b(1)(a). It is immaterial that the men who came to Whitney's aid did not see a gun or that the police failed to produce a gun at trial. Given that it convicted defendant of felonious assault and felony-firearm, the jury apparently found Whitney's testimony credible on this point, a determination that we will not disturb. See *Eisen*, 296 Mich App at 331.

A rational jury could equally have found that defendant restrained Whitney to facilitate the commission of a felony, another of the three alternative circumstances listed in the statute. See MCL 750.349b(1)(c). Defendant pulled Whitney to her feet—restraining her movements— then put her in a chokehold. The jury could reasonably have inferred that he pulled her to her feet to facilitate one or both of the subsequent felonies, assault by strangulation and felonious

assault. See MCL 750.82(1) (classifying felonious assault as a felony); MCL 750.84(1) (classifying assault by strangulation as a felony). As indicated by the plain language of the statute, which requires that a person knowingly restrain another person under *any* of the listed circumstances, and contrary to defendant's assertion on appeal, the prosecution was not required to prove that defendant secretly confined Whitney under MCL 750.349b(1)(b) in order to prove beyond a reasonable doubt the elements of unlawful imprisonment.[3] See MCL 750.349b; *Bosca*, ___ Mich App at ___; slip op at 7. Accordingly, viewing the evidence in a light most favorable to the prosecution, the prosecution satisfied beyond a reasonable doubt each element of unlawful imprisonment. See *Bosca*, ___ Mich App at ___; slip op at 7; *Gaines*, 306 Mich App at 296.

MCL 750.84(1)(b) proscribes assault by strangulation or suffocation. "Michigan generally defines an assault as either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Meissner*, 294 Mich App 438, 453-454; 812 NW2d 37 (2011) (citation and quotation marks omitted). A battery, in turn, is "an intentional, unconsented and harmful or offensive touching of the person of another . . . ." *Id*. at 454 (citation and quotation marks omitted). MCL 750.84(2) defines "strangulation or suffocation" as "intentionally impeding normal breathing or circulation of the blood by applying pressure on the throat or neck or by blocking the nose or mouth of another person."

Under MCL 750.92, Michigan's general attempt statute, "an 'attempt' consists of (1) an attempt to commit an offense prohibited by law, and (2) any act towards the commission of the intended offense." *People v Thousand*, 465 Mich 149, 164; 631 NW2d 694 (2001). The Michigan Supreme Court has further explained that the elements of MCL 750.92 include "an intent to do an act or to bring about certain consequences which would in law amount to a crime; and . . . an act in furtherance of that intent which, as it is most commonly put, goes beyond mere preparation." *Id*. (citation and quotation marks omitted).

Finally, because of the difficulty in proving the defendant's state of mind on issues such as knowledge and intent when sufficiency of the evidence is at issue, "minimal circumstantial evidence" is adequate to establish the defendant's state of mind, "which can be inferred from all of the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). More specifically, "[i]ntent may be inferred from a defendant's use of physical violence." *People v Dillard*, 303 Mich App 372, 377; 845 NW2d 518 (2013).

Sufficient evidence existed in this case for a rational jury to find that the prosecution had proved beyond a reasonable doubt the elements of attempted assault by strangulation. After defendant knocked Whitney into the snow, he pulled her up—not by her arm, hand, hair, waist, or any other body part—but by her neck. Once defendant got Whitney to her feet, he immediately applied a chokehold. When Whitney continued to scream and struggle, defendant pulled out a gun and cursed at her to shut up. Defendant's chokehold did not *completely* impede

---

[3] The language cited by defendant from *People v Railer*, 288 Mich App 213, 217; 792 NW2d 776 (2010), was specifically referring to what must be proved "to be guilty of unlawful imprisonment under MCL 750.349b(1)(b)[.]"

Whitney's breathing, but it was forceful enough to prevent her from removing his arm and to cause lingering pain after the incident.

Given this evidence, the jury could reasonably have inferred that defendant intended to cut off Whitney's breathing to stop her screams by choking her, both when he pulled her up by the neck and when he applied the chokehold. See *Thousand*, 465 Mich at 164; *Dillard*, 303 Mich App at 377; *Kanaan*, 278 Mich App at 622. A rational jury could also have found that defendant took two acts in furtherance of that intent—hauling her up by the neck and putting her in a chokehold. See *Thousand*, 465 Mich at 164. Thus, sufficient evidence existed to convict defendant of attempted assault by strangulation. See MCL 750.84(1)(b); *Gaines*, 306 Mich App at 296.

Defendant next contends that the trial court erred in denying his motion to suppress the second photographic lineup. He argues that the second photographic lineup was impermissibly suggestive because he was the only suspect included in both lineups and because Officer Manson placed defendant's newer photograph in the fourth position during the second lineup, the same position in which Whitney had earlier misidentified a suspect. We disagree.

Defendant did not argue below that the second photographic lineup was impermissibly suggestive because he was the only suspect included in both lineups. Accordingly, we review this argument for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Defendant did challenge below the placement of his photograph in the fourth position during the second photographic lineup. We review de novo a trial court's ruling on a motion to suppress evidence and the underlying constitutional issues. *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). We review for clear error a trial court's factual findings. *Id*. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014) (citation and quotation marks omitted).

"A photographic identification procedure or lineup violates due process guarantees when it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Henry (After Remand)*, 305 Mich App at 160-161 (citation and quotation marks omitted). Impermissible suggestion frequently occurs when authorities single out a suspect in some way, thereby leading a witness to presume that the suspect committed the crime. *People v Anderson*, 389 Mich 155, 178; 205 NW2d 461 (1973), overruled in part on other grounds by *People v Hickman*, 470 Mich 602 (2004). A court must consider the totality of the circumstances when determining if a particular identification procedure was impermissibly suggestive. *Henry (After Remand)*, 305 Mich App at 161.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [*People v Kurylczyk*, 443 Mich 289, 306; 505 NW2d 528 (1993) (citation and quotation marks omitted).]

The defendant bears the burden of establishing that a lineup was unconstitutional. *Id*. at 302. This Court has stated that "[t]he fact that a defendant whose photograph had been shown in a previous photographic show-up is the only participant in a subsequent lineup does not render the lineup procedure improper." *People v Currelley*, 99 Mich App 561, 568; 297 NW2d 924 (1980).

With regard to the officers' failure to use any of the other photographs from the first photographic lineup in the second photographic lineup, we find no plain error affecting defendant's substantial rights. Officer Manson testified that he arranged the second lineup because Sergeant Ortiz thought defendant—who was the only concrete suspect after LEIN records linked him to the green van—looked different and older in person than his driver's license picture indicated. Officer Mason explained that, for the second lineup, he chose photographs of individuals who more closely reflected defendant's different appearance in the new picture that Sergeant Ortiz had taken. Although defendant was the only suspect whose picture was in both photographic lineups, this did not render the lineup procedure improper. See *Currelley*, 99 Mich App at 568.[4] Moreover, had the officers used the photographs from the first lineup, defendant likely would have been singled out by his appearance, which differed from the other individuals. This would have been impermissibly suggestive. See *Anderson*, 389 Mich at 178.

Reviewing the totality of the circumstances, defendant has also failed to establish that the second photographic lineup was impermissibly suggestive based on the placement of his photograph in the fourth position, the same position in which Whitney had earlier misidentified a suspect. See *Henry (After Remand)*, 305 Mich App at 161. Officer Manson claimed that the placement was entirely random and was premised simply on his desire to put defendant's new picture in a different position in the second lineup. He also testified that he had no indication that Whitney had identified the suspect in the fourth position during the first lineup. But even assuming that Officer Manson knew that Whitney had tepidly identified the man in the fourth position, based on consideration of the relevant factors,[5] the likelihood of misidentification was low. See *Kurylczyk*, 443 Mich at 306. Admittedly, Whitney only had a brief moment to view defendant's features before he pulled his ski mask down, but she identified defendant in the second lineup after viewing the photographs for "a matter of seconds," and the second lineup took place only a day after the assault. Furthermore, Whitney appeared to pay a high degree of attention during the assault, testifying in detail regarding the timeline of the incident, what defendant did with his left and right hands, and what he said to her. Whitney's initial description of defendant to the sketch artist also resulted in sketch that, according to Officer Manson, resembled defendant. Accordingly, defendant has failed to establish that the placement of his photograph created a substantial likelihood of misidentification under the totality of the

---

[4] Although *Currelley*, 99 Mich App at 563-563, involved a photographic lineup and a subsequent in-person lineup, we find it equally applicable in the case of two photographic lineups.

[5] We note that the trial court did not consider these factors at the *Wade* hearing, but we, nonetheless, review de novo its conclusion that the identification was not impermissibly suggestive. In reviewing the totality of the circumstances, we also consider the testimony at trial in addition to the testimony from the *Wade* hearing.

circumstances and was accordingly *impermissibly* suggestive.  See *id*.; *Henry (After Remand)*, 305 Mich App at 160-161.

Affirmed.


/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Karen M. Fort Hood