# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MIAH DANIELLE STROUD,

        Defendant-Appellant.

UNPUBLISHED
March 8, 2016

No. 322812
Wayne Circuit Court
LC No. 14-000524-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TAMARRIS LOUIS ALDRIDGE,

        Defendant-Appellant.

No. 322879
Wayne Circuit Court
LC No. 13-008702-FC

---

Before: RONAYNE KRAUSE, P.J., and MARKEY and M. J. KELLY, JJ.

PER CURIAM.

Defendants Miah Stroud and Tamarris Aldridge were convicted, after a joint trial before a single jury, of second-degree murder, MCL 750.317, and three counts of felonious assault, MCL 750.82. The latter was also convicted of felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), third offense, MCL 750.227b. Defendants' convictions arise out of the shooting death of Antoine Holley, Sr., at his home in Detroit, in front of his girlfriend, Latasha Bargaineer, their son, Antoine Holley, Jr. (Holley Jr.), and Antoine's father Terrell Johnson.[1] The trial court sentenced Miah to concurrent prison terms of 25 to 40 years for the second-degree murder conviction and two to four years for each felonious assault conviction. The court sentenced Tamarris as a fourth habitual offender,

---

[1] Because many of the individuals involved share last names, we will generally refer to parties by their given names.

-1-

MCL 769.12, to concurrent prison terms of 60 to 90 years for the second-degree murder conviction, 15 to 25 years for the felon-in-possession conviction, and 10 to 15 years for each felonious assault conviction, to be served consecutive to a 10-year term of imprisonment for the felony-firearm conviction. Both defendants appeal as of right, and we affirm in each appeal.

Latasha and Antoine had been in an "on and off" relationship for almost three years. They resided together with their son, Holley Jr., and Antoine's father, Terrell. In July of 2013, one of Miah's half-sisters, Candy Simpson, moved into their residence and worked for Antoine as a prostitute. The living situation was highly unstable, and Latasha fought with both Candy and Antoine, even at one point pouring lighter fluid on the latter. On August 10, 2013, Antoine physically assaulted Candy and ordered her to leave. The next day in the early afternoon, a group of people, which included Miah; another half-sister of both Miah and Candy, Joezetta Harper; and Tamarris, came to Antoine's house. They demanded to know Candy's whereabouts and were upset about her getting "jumped on." Latasha and Terrell both noticed at the time that one of the sisters, who they identified at trial as Miah, looked more like Candy than the other; and a man, who they identified at trial as Tamarris, had a readily apparent glass eye. The group left after being told that Candy was not present.

Later that night, Johnson heard a knock at the door to the house and saw a person he identified as Miah, who he recognized as the person who looked like Candy from earlier that day, outside, apparently alone; she asked for Candy and, when Johnson informed her that Candy was not present, she asked for Antoine. Antoine came to the door and let Miah in, whereupon several men, one of whom Johnson immediately recognized as Tamarris, the man with the glass eye from earlier in the day, rushed in behind Miah. Two of the men, including Tamarris, were armed with guns. Miah went upstairs and confronted Latasha in a bedroom, stating she was looking for Candy, but Tamarris joined her and they escorted Latasha and Holley Jr. downstairs at gunpoint. Latasha also recognized Miah and Tamarris as Candy's sister and the man with the glass eye from earlier. Antoine and Terrell were on the floor, where the other man with a gun began "stomping" on Antoine. One of the men, believed to be the unidentified man with the handgun,[2] then shot Antoine in the head. The intruders then left the house.

Both defendants contend primarily that the trial court should have qualified Terence Campbell as an expert regarding eyewitness identifications and admitted his testimony, including adjourning trial to secure Campbell's availability. The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo; it is necessarily an abuse of discretion to admit legally inadmissible evidence. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). Although we agree in part with defendants that expert testimony regarding eyewitness identifications is, in the abstract, properly admissible pursuant to MRE 702, we find harmless the trial court's refusal to adjourn trial, qualify Campbell specifically as an expert, or admit his testimony into evidence.

The proponent of expert testimony must show that it "is reliable by showing that it 'is based on sufficient facts or data,' that it 'is the product of reliable principles and methods,' and

---

[2] Defendants' murder charges were premised on the theory that they were aiders and abettors.

that the proposed expert witness 'has applied the principles and methods reliably to the facts of the case.'" *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting MRE 702. The trial court's "gatekeeper" role entails only filtering out unreliable evidence, not resolving scientific disputes, discovering the absolute truth, or admitting only universally agreed-upon or totally uncontestable conclusions. *Id*, citing *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127, 139; 732 NW2d 578 (2007) and *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). An expert's "experience and background" are not generally sufficient to establish that proposed testimony is reliable, but "peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702" either. *Edry v Adelman*, 486 Mich 634, 641-642; 786 NW2d 567 (2010). Furthermore, "[t]he admission of expert testimony requires that (1) the witness be an expert, (2) there are facts in evidence that require or are subject to examination and analysis by a competent expert, and (3) the knowledge is in a particular area that belongs more to an expert than to the common man." *Surman v Surman*, 277 Mich App 287, 308; 745 NW2d 802 (2007).

As a general matter, expert testimony explaining the difference between how memories and eyewitness identifications are commonly believed to work and how they actually work *can* be helpful to assist the jury in evaluating the evidence before it. We further agree with defendants that there is a great deal of "good science" to the effect that witnesses' confidence in their recollections is uncorrelated with the actual accuracy of those recollections.

However, defendants make little concrete, case-specific argument beyond establishing the bare facts that eyewitness testimony is a murkier business than is commonly believed and that expert testimony can shed some light on the matter that juries may not know is needed. Taken at face value, defendants' argument essentially extrapolates a mandate that expert testimony is required *any time* a case involves eyewitnesses. We disagree. Where the jury is given ample evidence upon which to evaluate whether a witness's confidence is actually warranted, and where no circumstances would suggest that any such confidence is misplaced, we are unpersuaded that defendants' proposed expert testimony would be more than an academic lecture in the abstract. We are not prepared to make expert testimony a mandatory part of any trial involving an eyewitness by judicial fiat.

Defendants briefly and superficially point out, in no particular order, that Latasha and Terrell did not know them, that Latasha and Terrell only saw their assailants under fast-moving and high-stress circumstances, that the presence of weapons during the encounter would have drawn Latasha's and Terrell's attention, and that the lighting was poor. However, the evidence is that both witnesses saw defendants in well-lit situations during both encounters with them: one in broad daylight, the other, according to the witnesses, under ordinary household electric illumination. The first time they saw defendants was not a stress-free situation to be sure, but it was not the kind of perspective-warping, fast-paced, high-stress situation defendants discuss. It is highly significant that they *recognized* defendants during the second encounter, rather than seeing their assailants then for the first time. We do not find that the record supports defendants' contentions that the circumstances truly merit expert testimony to explain their significance. We do not find that the trial court abused its discretion or denied defendants' rights to present a defense by excluding Campbell's testimony. Consequently, the trial court's decisions not to adjourn trial to secure Campbell's availability and not to qualify him as an expert are moot.

Miah raises an additional argument concerning a photographic lineup in which Latasha initially selected one of Miah's sisters out of an array that did not include Miah. Latasha was subsequently informed that the person she selected was not one of the assailants and, apparently, that "another sister" was involved. Latasha was shown a second photographic lineup, out of which she selected Miah. Miah contends that the lineup procedure was impermissibly suggestive, so the trial court erred when it failed to suppress Latasha's identification of her. An identification procedure violates due process where "it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *People v McDade*, 301 Mich App 343, 357; 836 NW2d 266 (2013). The burden rests with the defendant to establish the due process violation. *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993). We find no error.

As an initial matter, we have reviewed the lineups themselves and are satisfied that the two individuals Latasha selected do not look particularly similar. Significantly, the record simply does not show that Latasha selected Miah's photograph on the basis of any alleged similarity to the first. Rather, the record indicates that Latasha's first identification was hesitant and based on either her perception that the person she selected looked similar to the female assailant who came to her home, or her perception that she looked like Candy. We presume that if any other relative of either Miah or Candy was present in that lineup, that fact would have been brought to our attention. In contrast, the record indicates that Latasha's selection of Miah was immediate and based not on similarity to the first photograph, but based on Latasha's statement that the person she selected was the person who came to her home and was present when Antoine was shot. We appreciate defendants' arguments that confidence and accuracy are not necessarily correlated, but in this instance, the record indicates that Latasha's selection of Miah was based on her memory of the night Antoine was shot rather than her memory of the prior lineup. The statement by a police officer regarding "another sister" was not made during an identification procedure, but rather during a general discussion about the status of the case.

We find that the photographic lineup was not unduly suggestive.

Miah next challenges the sufficiency of the evidence to sustain her convictions under an aiding and abetting theory, arguing that at most she was merely present. In reviewing a challenge to the sufficiency of the evidence, we review the evidence, including circumstantial evidence and reasonable inferences, in the light most favorable to the prosecution, and we defer to the jury's role in weighing the evidence or assessing witness credibility. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006); *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012). We find the evidence here amply sufficient.

Second-degree murder entails a death caused by the defendant acting with malice, meaning, *inter alia*, an intent to kill, and without justification or excuse. *People v Reese*, 491 Mich 127, 143; 815 NW2d 85 (2012). Felonious assault entails an assault with a dangerous weapon and the intent to injure or place a victim in fear of an immediate battery. *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). A person may be convicted of a crime they did not directly commit as an aider and abettor if they rendered any kind of assistance or support to the principal for the purpose of furthering the perpetration of the crime. *People v Henderson*, 306 Mich App 1, 10-11; 854 NW2d 234 (2014). A person is not an aider and abettor merely because they are present during the commission of a crime, even if they had knowledge beforehand that the offence would be committed. *People v Rockwell*, 188 Mich App 405, 412;

-4-

470 NW2d 673 (1991). Rather, the defendant must have intended the commission of the crime or have known that the principal intended its commission when the defendant rendered assistance. *People v Robinson*, 475 Mich 1, 6, 15; 715 NW2d 44 (2006). Culpability for aiding and abetting also extends to any natural and reasonably expected consequences of an intended crime. *Id.*, 7.

The evidence here showed that Miah was actively involved in looking for her half-sister and upset about the treatment her half-sister received at Antoine's hands. She returned to the house during the early morning hours and managed to gain entry to the house through inquiries to Terrell and a demand to speak to Antoine regarding Candy's whereabouts. Significantly, she appeared to be alone from inside the house, but four men entered behind her upon the door being opened; two of those men were armed with guns, one of which was a rifle. The evidence further shows that at least one of the men, Tamarris, had been with Miah earlier that day. The jury could reasonably infer that Miah was aware of their presence, aware of what angry people with guns tend to do with those guns, and facilitated their entry into the house by deceiving Terrell and Antoine into believing she was alone. The evidence shows that Miah was in no way surprised by the violent turn of events, and indeed was highly upset herself and worked in concert with Terrell, who had the rifle.

The testimony was sufficient to enable the jury to find beyond a reasonable doubt that Miah and the four men were acting pursuant to a common purpose of trying to find Candy and to seek vengeance against Antoine. Pointing a loaded gun at another person is almost *per se* an intent to kill, and certainly that intent is a reasonable inference; there was no indication that any of the home intruders were defending themselves. Likewise, an intent to place someone in fear of an immediate battery or worse can readily and properly be inferred from forcing one's way into a person's home with loaded weapons. Miah actively participated in and facilitated the commission of the murder and the assaults by gaining entry to the house for the entire party and, once inside, by searching for and then securing the occupants. Although the evidence indicated that the actual murder and felonious assaults were committed by the men armed with firearms, it is reasonable to infer from all the facts and circumstances that Miah either intended the commission of the crimes or knew that the crimes were intended by the armed individuals, or that Antoine's murder was a natural and probable consequence of the offenses Miah intended to aid or abet. Accordingly, the evidence was sufficient to support her convictions under an aiding and abetting theory of criminal responsibility.

Tamarris argues that he was denied his right to due process and a fair trial when Investigator Charles Weaver testified at trial that the photograph of Tamarris that was used in the photographic lineups had been obtained from a Department of Corrections database. He also argues that trial counsel was ineffective for failing to object to this testimony. We disagree.

Testimony regarding the procedures used by the police to compile the photographic lineup was relevant and material because counsel questioned the adequacy of the police efforts to compile a fair lineup in which Tamarris would not be singled out because of his eye injury. Indeed, counsel asserted in closing argument that the lineup that was assembled was not a "good" lineup because it did not include photos of individuals with eye injuries, notwithstanding that thousands of photos were available "through the Detroit police, Michigan State Police, Department of Corrections, the FBI." Counsel had also explored this issue during his cross-

examination of Investigator Weaver by eliciting that there may have been thousands of photographs available through the Department of Corrections's database.

Conversely, the jury was already aware that Tamarris had some unspecified prior felony conviction because counsel had stipulated, for purposes of the felon-in-possession charge, that Tamarris had a prior unspecified felony conviction. Such a stipulation is recognized as a permissible means of safeguarding against unfair prejudice where a defendant is charged with felon in possession of a firearm. *People v Green*, 228 Mich App 684, 691-692; 580 NW2d 444 (1998). Because the jury was already aware that Aldridge had a prior unspecified felony conviction, the additional disclosure that his photograph was obtained from a Department of Corrections's database was neither unduly prejudicial nor likely to affect the outcome of the proceeding, especially considering that the information was disclosed only to explain how the photographic lineup was compiled. Cf. *People v Von Everett*, 156 Mich App 615, 622-623; 402 NW2d 773 (1986).

Because the disclosure that Tamarris's photograph came from the Department of Corrections effectively told the jury nothing that was not already known, it could not have made a difference to the outcome of the trial, and indeed, it appears that defense counsel competently made use of that disclosure as part of a strategy to discredit the lineup. We therefore find that Tamarris's rights were not prejudiced and counsel was not ineffective.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Michael J. Kelly