# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DANIEL DWAYNE WRIGHT,

Defendant-Appellant.

UNPUBLISHED
April 27, 2017

No. 331269
Muskegon Circuit Court
LC No. 14-065320-FC

Before: BECKERING, P.J., and MARKEY and SHAPIRO, JJ.

PER CURIAM.

In this case, a jury convicted defendant, Daniel Dwayne Wright, of armed robbery, MCL 750.529; first-degree home invasion, MCL 750.110a(2); and unlawful imprisonment, MCL 750.349b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent sentences of 26 to 45 years' imprisonment for the armed robbery conviction, 11 to 25 years' imprisonment for the first-degree home invasion conviction, and 509 days' imprisonment for the unlawful imprisonment conviction, with credit for 509 days served. Defendant appeals his convictions by right. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

At the time of the incidents in question, Alexus Ervin lived in a house with her cousin, Nikki Paige; Paige's two children; Paige's boyfriend, Hollis Crosby; and Paige's 23-year-old nephew, Devonta Griggs. On August 12, 2014, at about 9:00 a.m., Ervin was upstairs sleeping in her bedroom. She was awakened by a man, later identified as co-defendant Bobby Gamble, who was standing over her wearing a Halloween mask and pointing a gun at her head. Gamble ordered Ervin to get up and forced her downstairs. When Ervin got downstairs, Gamble made her go into a bedroom, where she saw Griggs tied up and another man, defendant, standing next to him. Defendant was dressed in all black with a bandana covering his face from the nose down, and he was wearing latex gloves. Ervin had time to look at defendant; she specifically took notice of his eyes, his large hands, and his posture. Gamble and defendant made Ervin lay down on the bed, and then they tied her arms and legs.

Gamble turned his attention to Griggs, pointed the gun at him, and demanded that Griggs give him the money. Griggs believed that Gamble was referring to the money (approximately $1,200) that Griggs won gambling the day before. Griggs told Gamble that he did not have the money. Gamble then said that if Griggs did not hand over the money, he was going to shoot

-1-

him. Griggs told Gamble that he gave the money to Paige to hold. Gamble made Griggs call Paige from his cellular telephone and tell her to bring him his money. Paige was not home at the time. Ervin overheard Gamble and defendant talking about bringing Griggs to "somewhere on Superior [Street]." Gamble and defendant then put a pillowcase over Griggs's head, put him in a vehicle, and left. After Gamble and defendant took Griggs and left, Ervin untied herself, grabbed the kids, and ran to a neighbor's house to call 911. Ervin then called Paige and told her that two men broke into the house and took Griggs to somewhere on Superior Street.

Gamble and defendant took Griggs to a house on Superior Street. When they got there, they untied Griggs, removed the pillowcase from his head, brought him into the side yard of the house, and put him on his knees. Griggs was able to get a look at defendant without his mask. Soon after, Paige and Crosby were driving on Superior Street looking for Griggs when they saw defendant standing by a van and removing a bandana from around his neck. They pulled Paige's car up to where the van was parked, got out, walked up to defendant, and asked him where Griggs was. Defendant said that he did not have anything to do with the situation, and then he walked toward a house. Crosby walked around the side of the house, and Paige walked back to her car and got inside. When Paige got into her car, she heard gunshots and saw Crosby running back to the car from the side of the house. Crosby got back into Paige's car. Paige then saw Gamble, wearing the Halloween mask, come around from the side of the house and start shooting at her car. Multiple bullets hit Paige's car, and one bullet hit her in the left shoulder. Paige quickly backed her car out of the driveway, drove a short distance, and flagged down a police officer. When Griggs, who was still on his knees in the side yard, heard the gunshots, he ran away and escaped. After investigating, police arrested Gamble and defendant that same day.

The next day, August 13, 2014, Paige and Ervin went to the Muskegon County building to view a corporeal lineup of suspects. The lineup was conducted in a room in the basement of the county building. The lineup room was designed such that the side where the suspects were standing was well lit, and the side where the witness was standing was dim or dark. There was a two-way mirror separating the two sides of the room. The room had an engineering flaw in that if light was allowed to come into the witness's side through the open hallway door when the witness entered, then the two-way mirror lost its effect, and the suspects would have been able to see the witness on the other side of the mirror. The mirror itself was divided into three or four sections. There were also three or four "posts" or "slats" that framed and supported the sections of the two-way mirror, which could have potentially obstructed a witness's view, depending on the vantage point. The doorway that led from the hallway into the witness side of the room was in the far corner of the room.

Paige was the first witness to view the suspects at the corporeal lineup. She entered the witness side of the room and immediately identified defendant. Ervin was the second witness. Muskegon Police Detective Clay Orrison escorted Ervin into the witness side of the room. Due to the engineering flaw described earlier, Detective Orrison walked and stood in front of Ervin when they entered the room to prevent the suspects from seeing her through the two-way glass. Ervin initially stopped just inside the door, and Muskegon Police Officer Trevor Gerlach stood behind her. At first, Ervin "barely even came past the door," and Officer Gerlach had trouble closing the door behind her. Officer Gerlach testified that, because he was standing behind Ervin, but was taller than she was, he had the same "straight-on" view as Ervin. He testified that, from his point of view, he could not see defendant. Because of this, he testified that he had

reason to believe that Ervin also could not see defendant. Officer Gerlach also testified that Ervin seemed nervous. Detective Orrison was also standing near Ervin.

From her spot at the back of the room, Ervin initially identified a suspect, who was not defendant, as the perpetrator of the crime. After Ervin made her first identification, Detective Orrison realized that, due to her position in the back of the room and behind a post in the mirror frame, Ervin probably was not able to see all of the suspects in the lineup, including defendant. Detective Orrison suggested that Ervin move to the center of the room so that she could see the entire lineup. Detective Orrison escorted Ervin to the center of the room by touching her on the back of the arm. Once Ervin was at the center of the room and able to see all of the suspects, she changed her identification and picked out defendant as the perpetrator of the crime. Ervin identified defendant, saying that she was 90 percent sure it was him, and was only 10 percent sure it was the first suspect she identified. Ervin said that during the incident at her house, defendant wore a bandana or mask over the bottom half of his face, so she was focused on defendant's eyes, hands, and posture. Because of this, someone in the lineup room had the idea to have the suspects cover the bottom of their faces with their hands to simulate a mask. Ervin was then 100 percent sure that her identification of defendant as the perpetrator was correct.

On October 16, 2014, the trial court held a hearing regarding defendant's appointed counsel's motion to withdraw as counsel. During that motion, defendant expressed frustration with his retained counsel's preparedness in the district court and confirmed that he wished to discharge his attorney and proceed *in propria persona*. After making the requisite findings set forth in *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976), the trial court granted defendant's motion and allowed defendant to represent himself in court.

On October 28 and October 30, 2014, the trial court held pretrial conference hearings in which defendant appeared *in propria persona*. At the conferences, the trial court discussed newfound concerns regarding defendant's competence to stand trial and his ability to represent himself. The court noted that it had received a couple of letters from defendant that caused the court some concern. Defendant requested that the court amend his bond and allow him to be released on personal recognizance (PR bond). Defendant wished to be released on a PR bond so that he could "claim what rightfully belongs to [him]." According to the letter that defendant wrote to the trial court, and as he explained at the hearing, defendant's true name, based on his "rootreading and genetic code" and according to the "sacred order of Ifa," which "deals with different expressions of consciousness, energy patterns of that sort," and based on "numerology, astrology, ontology," is Mwata Oba Olatundé. In addition, according to defendant, he is the "rightful heir to the throne of Ile Ife" in "Oshun State, Nigeria." Defendant also admitted, however, that he is a lifelong resident of Muskegon County and has never been to Nigeria. Defendant sought to change his bond so that he could go to Nigeria and claim what rightfully belonged to him. The trial court also found concerning defendant's statement, "If I'm able to incorporate my divine kingship and its resources with this great land, we will be able to usher in a thousand years of peace and prosperity[.]" After receiving defendant's letter regarding his connection to Nigeria, the trial court pulled defendant's presentence investigation report (PSIR) from a conviction in 2011 to see if there were any issues of mental health. Although the court did not discuss on the record the specifics of defendant's mental health history, it did note that the PSIR contained information regarding voluntary commitment to a facility in Traverse City, the diagnosis received there, and "some other issues."

-3-

The trial court, after denying defendant's request for a PR bond, addressed its concerns about defendant's having knowingly or intelligently waived his right to counsel. The court stated that the information in the PSIR, combined with what defendant was saying about his connection to Nigeria, and its obligation to indulge every presumption against waiver of counsel because it is so important, caused it to conclude that defendant did not knowingly and intelligently waive his right to counsel. The trial court memorialized its ruling in a written opinion and order, stating in relevant part,

2. The court, in light of additional information, finds that defendant's waiver of counsel does not satisfy the applicable standards, and suspends its own previous finding which allowed the defendant to represent himself.

3. The court will appoint counsel for the defendant at this time. This appointment might be reconsidered if the court can conclude that defendant can validly waive this important right.

4. The court refers the defendant to the Forensic Center to evaluate his competency to stand trial. If he is deemed competent to stand trial, and after the court carefully considers the complete evaluation, the court might again consider the waiver of counsel issue.

On December 23, 2014, the trial court held a competency hearing. Attorney Brian Hosticka represented defendant at the hearing. The court reviewed a competency report submitted by a Dr. Boersma. The court "adopt[ed Dr. Boersma's] conclusions as its own," and found defendant "competent to stand trial." After the court found him competent to stand trial, defendant did not renew his motion or otherwise voice his desire to represent himself once again. Attorney David Kortering took over defendant's case on February 20, 2015,[1] and represented defendant at each subsequent motion hearing and throughout trial. Defendant never again renewed his motion or otherwise voiced his desire to represent himself.

On May 29, 2015, defendant, while represented by counsel, submitted a motion to suppress Ervin's identification during the corporeal lineup, alleging that the identification procedure was "unduly suggestive and conducive to irreparable misidentification[.]" The trial court held two hearings for this motion: one on June 19, 2015, and one on July 28, 2015. On July 29, 2015, the trial court issued a written opinion and order denying defendant's motion to suppress.

## II. ANALYSIS

### A. SELF-REPRESENTATION

---

[1] Kortering substituted for Brian Hosticka, whom the court had appointed to "quarterback" while defendant underwent his competency evaluation.

On appeal, defendant first argues that the trial court denied him his right to self-representation. We disagree. "We review for clear error the trial court's factual findings surrounding a defendant's waiver. However, to the extent that a ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (quotation marks and citation omitted). We review a trial court's decision to permit a defendant to represent himself for an abuse of discretion. *People v Hicks*, 259 Mich App 518, 521; 675 NW2d 599 (2003). An abuse of discretion occurs when the trial court chooses an outcome falling outside this principled range of outcomes. *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

A criminal defendant's right to represent himself is implicitly guaranteed by the United States Constitution, US Const, Am VI, and is explicitly guaranteed by the Michigan Constitution, Const 1963, art 1, § 13, and MCL 763.1.[2] However, the right to self-representation is not absolute. *Anderson*, 398 Mich at 366. Before a defendant may waive his right to counsel and proceed with self-representation, the trial court must determine that he satisfied several requirements. First, the defendant must unequivocally ask to represent himself. *People v Williams*, 470 Mich 634, 642; 683 NW2d 597 (2004). Second, the court must determine that the defendant waived the right to counsel knowingly, intelligently, and voluntarily. *Id*. Third, the court must determine that the defendant's self-representation will not disrupt, unduly inconvenience, or burden the court. *Id*. Fourth, the court must comply with the requirements of MCR 6.005. *Id*. at 642-643. MCR 6.005 requires that the court advise the "defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation." MCR 6.005(D). It also requires that the court offer "the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer." *Id*. Moreover, the court must "indulge every reasonable presumption against waiver of [the right to counsel]." *Williams*, 470 Mich at 641, quoting *Johnson v Zerbst*, 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938).

Defendant argues on appeal that the trial court erred in failing to permit him to represent himself. Defendant first implies that the trial court erred in withdrawing its permission for him to represent himself, asserting that, "rather than ascertaining whether or not defendant was validly exercising his constitutional right, the court withdrew its permission, referred him to the forensic center, and subsequently appointed new counsel." He next contends that he believed his request was "properly before the court, yet the court failed to address it"; specifically, he implies

---

[2] MCL 763.1 provides:

> On the trial of every indictment or other criminal accusation, the party accused shall be allowed to be heard by counsel and may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and meet the witnesses who are produced against him face to face.

that the trial court erred by not sua sponte raising the issue of self-representation after finding defendant competent to stand trial.[3] We disagree.

Regarding the implication that the trial court improperly withdrew its permission for defendant to represent himself, we note that the trial court went to great lengths to analyze defendant's request for self-representation under the applicable caselaw and standards. Almost immediately thereafter, however, defendant made statements to the trial court that caused the trial court to call into question defendant's mental health. Instead of acting precipitously on the concerns raised by defendant's statements, the trial court sought and obtained information from defendant's recent PSIR indicating that defendant had past mental health issues.[4] These facts, coupled with the strong presumption against waiving the right to counsel, do not leave us with a "definite and firm conviction," *Miller*, 482 Mich at 544, that the trial court made a mistake by finding that defendant's waiver of his right to counsel was not knowingly and intelligently made.

Defendant next implies that, once the court found him competent to stand trial, it should have readdressed the issue of his right to self-representation sua sponte. Defendant has not presented any authority to support this presumption regarding the trial court's obligations. Where a defendant has waived the assistance of a lawyer, the court is obligated at each subsequent proceeding to advise him or her of the continuing right to have a lawyer's assistance, including at public expense if the defendant is indigent. MCR 6.005(E). However, defendant cites no authority imposing on the court a similar obligation where the court has granted, then properly withdrawn, permission for a defendant to represent himself. "An appellant may not

---

[3] Defendant implies that the error extends back to his request at the start of the preliminary examination that the district court dismiss his court-appointed counsel, James Marek, allow him to represent himself, and appoint "co-counsel to assist [him] in all preparations of motions and subpoenas and whatnot." It appears from the transcript that defendant based his request on dissatisfaction with Marek for being unprepared and having obtained an adjournment of the first preliminary examination date, arriving late for the second preliminary examination date, resulting in another adjournment, and failing to object when the prosecution amended the information to name him as co-defendant with Gamble. The district court judge attempted to explain to defendant why the two adjournments were not Marek's fault (Marek received the appointment because of a conflict of interest in joint representation the day before the examination), why the prosecution had named defendant as co-defendant with Gamble, the severity of the charges against him, and the dangers in representing himself. However, defendant repeatedly interrupted the court, eventually becoming unruly to the point of the court threatening to have him removed to a cell and conducting the preliminary examination via video. The district court explained that it was proceeding with the preliminary examination, and if bound over, defendant could renew his request to represent himself in the circuit court. At the end of the preliminary examination, defendant withdrew his motion to represent himself.

[4] It is not clear when the trial court obtained defendant's 2011 PSIR. At the October 28, 2014 pre-trial conference, the court asked defendant about some of the details of his ancestral claims and if he had a history of mental illness. Regarding the latter, defendant replied, "Not really. No." By the October 30, 2014 pre-trial conference, the court clearly had obtained the PSIR.

merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Additionally, we note, and defendant concedes, that after the court found him competent to stand trial, defendant asserted no desire to resume representing himself. It is clear from the record that defendant knew how to express his wishes to his attorney and to the court, and that the court might be willing to reconsider the issue of self-representation. Defendant had an opportunity at the December 23, 2014 hearing regarding the results of defendant's evaluation to reassert his desire to represent himself, when the trial court engaged defendant in a discussion of whether he wanted a copy of the competency evaluation. Rather than raise the issue, at this hearing or at any of multiple subsequent hearings, defendant spent the next year benefitting from court-appointed representation without unequivocally or otherwise indicating his desire to resume self-representation. Given defendant's understanding of the complexity of the case, the possible consequences, and that he would not be appointed co-counsel should he chose to again represent himself[5], and considering that he appears to have had good working relationships with attorneys Hosticka and Kortering, defendant's year-long silence may reasonably be understood as a choice made after his competency evaluation to take advantage of his right to counsel. To the extent that defendant's silence rendered his position concerning self-representation ambiguous, the court was obligated to indulge "every reasonable presumption against waiver" of the right to counsel. *Williams*, 470 Mich at 641, quoting *Zerbst*, 304 US at 464; 58 S Ct 1019; 82 L Ed 1461 (1938).

Further, assuming arguendo that defendant wanted to resume self-representation, and that the trial court had an obligation to readdress the issue sua sponte, defendant's silence on the matter after conclusion of the finding of competency arguably is analogous to harboring error as an appellate parachute, from which he cannot benefit on appeal. *People v Pipes*, 475 Mich 267, 278 n 39; 715 NW2d 290 (2006) (citation omitted). Under the particular facts of this case, we conclude that the trial court did not abuse its discretion by withdrawing its permission to allow defendant to represent himself, nor did it err by in not revisiting the issue sua sponte after finding defendant competent to stand trial.

### B. LINEUP IDENTIFICATION

Defendant next argues that the trial court erred by denying his motion to suppress Ervin's corporeal lineup identification. We disagree. We will not reverse a trial court's decision to admit identification evidence unless it is clearly erroneous. *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993). Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id*.

---

[5] The trial court had explained in detail to defendant at the October 16, 2014 hearing that other than arranging for access to a law library and clerical assistance from a law firm, it does not provide co-counsel to defendants who chose to represent themselves.

Eyewitness identification issues are grounded in the Due Process Clause, US Const, Am VI, XIV. *Perry v New Hampshire*, 565 US 228, 231-232; 132 S Ct 716; 181 L Ed 2d 694 (2012). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id*. at 238-239. Even when police use such a procedure, per se exclusion is not an appropriate action. *Id*. at 239. Instead, the court must determine, on a "case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification." *Id*. (quotation marks and citation omitted). Courts evaluate the fairness of an identification procedure in light of the totality of the circumstances. *Id*. at 239-240. See also *Kurylczyk*, 443 Mich at 311-312. Factors relevant to the totality of the circumstances include

> the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the identification. [*Kurylcyk*, 443 Mich at 306 (quoting *Neil v Biggers*, 409 US 188, 199-200; 93 S Ct 375; 34 L Ed 2d 401 (1972).]

First, defendant has not shown that the lineup identification procedure was impermissibly suggestive. Detective Orrison instructed Ervin to move to the center of the room so that she could have a clear view of all the suspects in the lineup. He may have even touched the back of her arm to escort her to the center of the room. However, Detective Orrison never directed Ervin's attention directly at defendant (or any other suspect) or otherwise hinted at which suspect was the alleged perpetrator. See *United States v Wade*, 388 US 218, 232-233; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) (discussing examples of impermissibly suggestive police conduct, including that the defendant was pointed out to the eyewitness). Rather, it appears that Detective Orrison remedied a situation in which the witness did not have a clear view of the entire lineup by having her move to a position where she could see the entire lineup. Therefore, the police lineup identification procedure was not impermissibly suggestive.

Next, defendant has not shown that this lineup procedure was unnecessary. Defendant was wearing a bandana over the bottom half of his face during the robbery. However, Ervin got a good look at defendant while he was wearing the bandana. In fact, because defendant was wearing a bandana, Ervin specifically focused on defendant's eyes, hands, and posture. Therefore, she was in the best position to identify defendant as the suspect who wore the bandana during the robbery. Moreover, the robbery had taken place less than 24 hours earlier. The police needed the witnesses to identify the suspect before memories faded with time. Therefore, the police lineup identification procedure was not unnecessary.

Even assuming that defendant can show that the identification procedure was impermissibly suggestive and unnecessary, he cannot show that the procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification. Ervin was present at the time of the crime. She testified that she clearly saw defendant when he had a bandana covering his face from the nose down. She specifically focused on his eyes, hands, and posture. Furthermore, she stated that she was 90 percent sure, and then 100 percent sure, of her identification of defendant. Finally, less than 24 hours had passed between the robbery and her identification. The handling of the lineup procedure under

the circumstances presented was not so suggestive as to lead to a substantial likelihood of misidentification. See *Biggers*, 409 US at 199-200. Therefore, the trial court did not clearly err in denying defendant's motion to suppress Ervin's corporeal lineup identification.

Regardless, error in admitting testimony tainted by impermissibly suggestive procedures warrants reversal only when the error is not harmless. *Kurylczyk*, 443 Mich at 315-316. The error is not harmless if "an average jury would have found the prosecution's case 'significantly less persuasive' without the erroneously admitted testimony. *Id*. at 315. "However, if it can be shown beyond a reasonable doubt that the testimony did not affect the jury's verdict, then the [error is harmless]." *Id*. at 315-316.

Here, Paige also identified defendant as the perpetrator of the crime during a corporeal lineup. Paige saw defendant without his mask on. Griggs and Crosby also saw defendant without his mask on and identified him. Given that multiple witnesses identified defendant, an average jury would not likely have found the prosecution's case significantly less persuasive without Ervin's testimony. Therefore, even assuming that the trial court clearly erred in denying defendant's motion to suppress, such error was harmless and, as such, does not warrant reversal. *Kurylczyk*, 443 Mich at 315-316.

## III. CONCLUSION

We conclude that the trial court did not abuse its discretion when it withdrew its permission for defendant to represent himself pursuant to concerns that defendant did not waive his right to counsel knowingly or intelligently. We also conclude that, absent a motion from defendant, the trial court did not commit reversible error by not returning to the issue sua sponte after finding defendant competent to stand trial. Finally, we conclude that the trial court's decision to admit Ervin's identification of defendant in a corporeal lineup was not clearly erroneous.

Affirmed.

/s/ Jane M. Beckering
/s/ Jane E. Markey
/s/ Douglas B. Shapiro