*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

EDWARD LEE WATKINS,

        Defendant-Appellant.

UNPUBLISHED
September 12, 2019

No. 340906
Wayne Circuit Court
LC No. 15-005089-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBBIE DESHAWN TAYLOR,

        Defendant-Appellant.

No. 341307
Wayne Circuit Court
LC No. 15-005089-02-FC

Before: JANSEN, P.J., and CAMERON and TUKEL, JJ.

PER CURIAM.

In these consolidated appeals, codefendants Edward Lee Watkins and Robbie Deshawn Taylor, who were tried jointly before a single jury, each appeal their convictions at their second trial. Their first joint trial ended in a mistrial when the jury was unable to reach a verdict. In Docket No. 340906, defendant Watkins appeals his convictions of first-degree premeditated murder, MCL 750.316(1)(a), two counts of assault with intent to commit murder, MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced Watkins to life imprisonment without parole for his first-degree murder conviction, 15 to 25 years in prison for each assault conviction, and two years' imprisonment for his felony-firearm conviction. In Docket No. 341307, defendant Taylor appeals his convictions of first-degree premeditated murder and two counts of assault with intent to commit murder. The trial court sentenced Taylor to life imprisonment without parole for his

-1-

first-degree murder conviction and 20 to 30 years in prison for each assault conviction. In both dockets, we affirm defendants' convictions and sentences.

## I. FACTUAL BACKGROUND

Defendants' convictions arise out of a drive-by shooting in Detroit on the evening of May 14, 2015, which wounded several people and killed one. The prosecutor's theory of the case was that (1) the codefendants and an accomplice, Kenneth "Kya" Burnett, were members of a gang or rap group known as the "Turn-around Boys" or "Turn-around Gang," (2) they planned and committed the drive-by shooting as retaliation against Montez "Tez" Gantz and Terry Williams, who were members of a rival group, the "Forever Boys," (3) defendants did so because they believed that Gantz and Williams had shot Burnett and Taylor during a prior shooting, and (4) Taylor was the driver of the stolen minivan that was used in the drive-by shooting, while Watkins and Burnett were shooters. Gantz and Williams both were shot and wounded during the drive-by shooting, but a third victim, 22-year-old Paige Walker, was killed.

Several victims and eyewitnesses provided accounts of the drive-by shooting at trial. Like Gantz, Williams testified at trial that he did not see who shot him during the drive-by shooting. He admitted, however, that when he was initially interviewed by the police, he implicated defendants as the shooters, but explained at trial that he had "made some names up." Specifically, Williams told the police that he "saw Boss Man Teezy [i.e., Taylor] in the driver's seat" of an "older model" "white minivan" and that "Savage [i.e., Watkins] was armed with an assault rifle" and was the person who shot Williams. Williams also told the police that there might have been "other people in the van" as well, but Williams could not identify them. At trial, Williams explained, "I mean, I was in the hospital, Dying [sic], and I just wanted to put it— something on somebody." When asked whether he had intended for the "wrong people to be convicted," Williams stated that he had not "cared," simply wanting *someone* to be convicted. Williams agreed that he was not "comfortable" with the idea of "snitching," but he stated that his trial testimony had "nothing to do with the code of the street" and was, instead, "about right and wrong"—i.e., correcting his prior false statements to the police implicating defendants. Williams admitted, however, that he had previously testified under oath that his initial statements to the police were true.

Williams also denied that anyone had pressured him to perjure himself or to recant his prior testimony against defendants. However, Williams admitted that shortly before defendants' first trial began, he had sent text messages to a police sergeant denying that he actually knew who had been involved in the drive-by shooting. Williams's text messages to the police sergeant also stated:

> I don't want to testify period. I'm done with that. I'm afraid of retaliation and you guys can't save me.

* * *

> They know where I live. I have no protection. My girl have no protection. If those guys go to jail, their friends are going to kill me.

* * *

-2-

I would rather be in jail than dead.[1]

After Williams made his initial statement to the police, he was shown several photographic array lineups. In one, he took 20 seconds to identify Taylor as the driver from the drive-by shooting. However, Williams was unable to identify Watkins in the first two photographic lineups that he was shown, each of which featured an older photograph of Watkins and photographs of five "fillers." During the first photographic lineup, which utilized a photograph of Watkins that had been taken when he was 16 years old, Williams "picked fillers." During the second lineup, which used a slightly less dated photograph of Watkins at 18 years of age, Williams made no selection. A third lineup was subsequently conducted using a more recent photograph of Watkins at 20 or 21 years of age, and Williams identified Watkins as the shooter in the drive-by shooting.

At trial, Williams testified that his identification of Watkins had been a matter of happenstance, explaining: "On a line-up, I was just picking people. It took me, like, three tries. They kept coming back and forth with different line-ups and I was just picking people." Williams further explained that he had been "in the hospital" and "drowsy" from his "meds the whole time."

On the evening of December 31, 2016, which was after the defendants' first trial but before their second trial, the police apprehended Burnett, who was in possession of an AK-47 style weapon with a "drum-style" magazine. The AK-47's drum magazine, which can hold 75 rounds of ammunition, was loaded with more than 50 rounds. Ballistics testing later revealed that at least 41 of the shell casings recovered at the scene of the drive-by shooting had been fired by the AK-47 that was seized from Burnett.[2]

At the conclusion of the third day of defendants' second trial, the trial court received a note from a juror that it felt might have "reflect[ed] the concerns of" other jurors as well. The note stated, "The big group of people in the back made a few of us uncomfortable eyeballing the jury." The trial court indicated that it would take steps to ensure that no intimidation occurred, and promised that the court's security staff would be particularly vigilant. After excusing the jury, the trial court admonished defendants to contact their many in-court "supporters" and to tell them to stop "grinning at" the jury. At the beginning of the fourth day of trial, Taylor's trial counsel moved to have the "tainted" juror who had sent the note the day before removed from the sitting jury and placed, instead, as an alternate juror. The trial court denied that request without prejudice, stating that it would reconsider the matter if it appeared that the jury intimidation was continuing or had biased the jurors. Taylor's trial counsel argued, "Well, then

_____

[1] At defendants' second trial, Williams indicated that he had not actually been afraid to testify. Instead, he had lied about being in danger in the hope that, as a result, he "[woul]dn't have to come to court and lie."

[2] Although the police believed that Burnett was a "possible suspect" who might have been involved in the drive-by shooting, and he was still under police investigation at the time of defendants' second trial, he had not been questioned regarding his potential involvement.

the next appropriate remedy is a mistrial," and the trial court responded, "I have no basis for entertaining anything like that at this point."

Following the lunch recess on the fourth day of trial, one of the jurors reported that, during the third day of trial, he had been approached in the restroom by a man, later identified as Dominique White, whom the juror recognized as a spectator from the gallery. White asked the juror "if it was going up or down[.]" The juror reported the incident to other members of the jury, who advised him to inform the trial court. When the issue was discussed on the record (but not in the presence of the jury), White admitted that he was a friend of the defendants and that he had approached the juror and asked how the trial was going. White claimed to have been unaware that this was inappropriate. Upon further questioning, the juror indicated that he did not know whether White was associated with anyone in particular from the trial. Although the out-of-court contact had made the juror feel "[a] little uncomfortable," he felt that it would not affect his judgment in any way.

On the fifth day of trial, Watkins's trial counsel objected to the introduction of images— as against Watkins—that had been "extracted" from Taylor's cell phone. The prosecutor conceded that the images in question were being offered only against defendant Taylor, and the trial court instructed the jury that the images would only be admitted as such.

Also on the fifth day of trial, the prosecutor sought to introduce a custodial witness statement provided to the police by Taylor on May 27, 2015. Watkins's trial counsel objected. Following a sidebar conference, the trial court instructed the jury as follows:

> All right. Um, ladies and gentlemen, the statement . . . by Robbie Taylor is being offered only against Robbie Taylor. You're not to consider it in any way as evidence against Watkins. There's actually nothing in the statement that would indicate Watkins anyway. But just so you know it's just as to Taylor.
>
> * * *
>
> Uh, [Watkins's trial attorney] has objected for the record. Objection is overruled.

Following the second jury trial, defendants were convicted and sentenced as noted earlier. These appeals ensued.

## II. DEFENDANT WATKINS'S CLAIMS

On appeal, defendant Watkins first argues that the trial court erred by denying Watkins's motion to suppress evidence concerning the photo-array lineups and Williams's subsequent in-court identification. Specifically, Watkins contends that the "repeated presentation" of defendant Watkins's photo to Williams in three consecutive photographic array lineups made the third lineup unduly suggestive. We disagree.

-4-

As this Court observed in *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013):

> A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous. Issues of law relevant to a motion to suppress are reviewed de novo. Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made. [Citations omitted.]

"[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *People v Hickman*, 470 Mich 602, 607; 684 NW2d 267 (2004) (emphasis omitted), quoting *Moore v Illinois*, 434 US 220, 227; 98 S Ct 458; 54 L Ed 2d 424 (1977). However, "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry v New Hampshire*, 565 US 228, 248; 132 S Ct 716; 181 L Ed 2d 694 (2012). "When no *improper* law enforcement activity is involved," suppression is not warranted; instead, in such instances it suffices to test the reliability of the eyewitness identification evidence "through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id*. at 233 (emphasis added).

In this instance, the prosecution concedes that the use of three different photographs of Watkins in each of the three photographic arrays was "suggestive" to some degree. However, the prosecution argues that the process was not *unnecessarily* suggestive, noting that this procedure was only utilized because the police initially only had dated photographs of Watkins. Given the record evidence, we find the prosecution's argument persuasive. There is no evidence suggesting that the police employed the particular procedures purposefully or in bad faith. On the contrary, to increase the likelihood of a reliable identification, the police would have been motivated to use the most *recent* photograph of Watkins that they possibly could, not to hunt up dated photographs of him that would not as accurately depict his age and appearance at the time of the offense. Because this pretrial identification procedure was the result of practical investigatory limitations—not of improper law enforcement activity—suppression was unwarranted even if the identification procedure was, in fact, suggestive.

In any event, "a suggestive lineup is not necessarily a constitutionally defective one. Rather, a suggestive lineup is improper only if under the totality of the circumstances there is a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 306; 505 NW2d 528 (1993). Accord *McDade*, 301 Mich App at 357 ("[a] photographic identification procedure or lineup violates due process guarantees when it is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification"). Under the totality of the circumstances in the case at bar, the photographic array procedure utilized by the police did not lead to a substantial likelihood of misidentification. Long before selecting Watkins's photograph during the third lineup, Williams had identified Watkins by his "street name," "Savage," and indicated that "Savage" was associated with "Boss Man Teezy," i.e., Taylor. There is no dispute that

Watkins's "street name" is, in fact, "Savage," nor is there any factual dispute about the fact that he and Taylor are closely associated with one another. In our view, these independent "indicia of reliability are strong enough to outweigh the corrupting effect of the . . . suggestive circumstances[,]" such that it was proper to admit the disputed identification evidence and allow the jury to "determine its worth." See *Perry*, 565 US at 232 (alteration in original). Hence, the trial court did not clearly err by denying Watkins's motion to suppress the contested identification evidence.

Watkins also raises several claims of ineffective assistance of counsel. With regard to each, we conclude that Watkins has failed to rebut the strong presumptions that his trial counsel performed effectively and employed reasonable trial strategy.

Because the trial court did not hold a *Ginther*[3] hearing, "our review is limited to the facts on the record." *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). "Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact"—if any exist—"and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). The "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. [*People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012) (citations omitted).]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The "reasonable probability" standard can be satisfied by less than a preponderance of the evidence. *Trakhtenberg*, 493 Mich at 56.

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland*, 466 US at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Thus, there is a "strong presumption that trial counsel's performance was strategic," and "[w]e will not substitute our judgment for

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

that of counsel on matters of trial strategy[.]" *Id.* at 242-243. "Yet a court cannot insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. "The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). Accordingly, the reviewing court must consider the range of potential reasons that counsel might have had for acting as he or she did. *Id.*

Relying on MCR 6.121(C) and (D), Watkins argues that his trial counsel should have moved to sever the codefendants' trials or, at a minimum, moved for separate juries. We conclude that Watkins has failed to rebut the strong presumption that his trial counsel employed reasonable trial strategy in this regard. On the whole, the evidence in this case implicating Taylor in the drive-by shooting was far stronger than the evidence implicating Watkins. Taylor—not Watkins—was shot in the April 17, 2015 shooting. Accordingly, Taylor had a *direct* motive to seek revenge against those whom he judged responsible. Moreover, Williams promptly identified Taylor as the driver from the drive-by shooting during his first photographic array, whereas he was initially unable to identify Watkins, instead identifying two "fillers." Under the circumstances, a competent trial attorney might have reasonably decided that a joint trial before a single jury was the best option for Watkins, even if it posed the danger that some evidence that was otherwise inadmissible against Watkins might be placed before the jury. Specifically, this trial format afforded the jury *a* culprit if it acquitted Watkins; it gave the jury the opportunity to hold someone responsible for Paige Walker's death—by convicting Taylor— even if the jury was not convinced beyond a reasonable doubt of Watkins's involvement. Because Watkins has failed to rebut the presumption that counsel's strategy in this regard was reasonable, we reject his claim of ineffective assistance.

Without citing any authority or specific rule of evidence in support, Watkins next argues that his trial counsel performed ineffectively by failing to object to evidence that Taylor was motivated to commit the drive-by shooting because of the April 17, 2015 shooting. By failing to cite any authority in support of this claim of error, Watkins has abandoned it. See *People v Hill*, 221 Mich App 391, 397 n 2; 561 NW2d 862 (1997). And because he provides no specific legal theory under which the disputed evidence might have been excluded, his instant claim of error necessarily fails on its substantive merits as well. Without explaining how an objection would have, or at least *could* have, been successful, Watkins cannot demonstrate that trial counsel performed below an objective standard of reasonableness by failing to object to the admission of the contested evidence. See *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007) ("Counsel is not ineffective for failing to make a futile objection.").

Watkins also argues that trial counsel performed ineffectively by failing to call Kyle Greenlaw as an alibi witness at trial. In support, Watkins relies on an affidavit that was not notarized, purportedly executed by Greenlaw, in which Greenlaw asserts that he was with Watkins at the time of the drive-by shooting and therefore has "personal knowledge that [Watkins] did not commit the crimes he was convicted of" below. However, Greenlaw's affidavit goes on to explain that he did not testify at either of Watkins's two trials because he "had an outstanding warrant for CCW." In other words, the affidavit establishes that Greenlaw was previously *unwilling* to testify. Watkins has presented no evidence indicating that his trial

counsel nevertheless could have compelled Greenlaw's attendance at trial or that, had counsel successfully subpoenaed him, Greenlaw would have offered testimony favorable to Watkins—despite having been ordered to court against his will. Hence, Watkins's claim of ineffective assistance of counsel necessarily fails. Even accepting the contents of Greenlaw's affidavit at face value, Watkins has failed to present any record evidence overcoming the strong presumptions that counsel performed reasonably and employed effective trial strategy with regard to Greenlaw.

Finally, Watkins argues that trial counsel performed ineffectively by failing to move for a mistrial "when it became apparent that the jury was tainted and possibly prejudiced" as a result of the in-court intimidation tactics and White's out-of-court conversation with one of the jurors. Watkins's argument presupposes that the *only* reasonable conclusion for trial counsel to have reached was that the attempts to intimidate or influence the jury had biased the jury *against* defendants. But that is not so. Given the gang-violence overtones of this case, a reasonable trial attorney might just as well have decided not to move for a mistrial because the spectators' attempts to intimidate the jury might have been *successful*. In other words, counsel might have reasonably believed that it was more likely that the intimidation tactics would work against at least *one* juror than it was that those tactics would prejudice the *entire* jury pool to vote against convicting Watkins. Therefore, Watkins has failed to rebut the strong presumption that his trial counsel employed effective strategy in deciding not to move for a mistrial.

### III. DEFENDANT TAYLOR'S CLAIMS

Defendant Taylor also raises several claims of error on appeal. First, he contends that, although his trial counsel did not object, the trial court abused its discretion by failing to sua sponte prevent the prosecutor from interjecting gang-related evidence and arguments at trial, particularly concerning gang intimidation of witnesses. We find no error warranting reversal.

Taylor acknowledges that he raised no objection to the disputed evidence or arguments below, and thus his instant claim of error is unpreserved, see *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001), and subject to plain-error review, see *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). The plain-error test has "four elements":

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) . . . the plain error affected substantial rights . . . [, and 4) ] once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018), quoting *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (alterations and ellipses in *Randolph*).]

"A 'clear or obvious' error under the second prong is one that is not subject to reasonable dispute." *Randolph*, 502 Mich at 10. The third element "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460

Mich at 763. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id*. (quotation marks and citation omitted).

Although Taylor does not cite any specific rule of evidence in support of his evidentiary argument, the central theme is that the evidence of defendants' gang affiliations was inadmissible because it was admitted as improper propensity evidence and because it was more unfairly prejudicial than probative. In other words, Taylor's argument hinges on MRE 404(b) and MRE 403.

As this Court explained in *People v Bass*, 317 Mich App 241, 259; 893 NW2d 140 (2016):

Other-acts evidence is admissible only if

> (1) the evidence is offered for some purpose other than under a character-to-conduct theory, or a propensity theory, (2) the evidence is relevant to a fact of consequence at the trial, and (3) the trial court determines under MRE 403 that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. If requested, the trial court may provide a limiting instruction under MRE 105.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. When balancing the probative value of evidence of prior bad acts against the danger of unfair prejudice from the evidence, a court must be cognizant that propensity evidence is prejudicial by nature. However, MRE 403 does not prohibit prejudicial evidence; only evidence that is unfairly so. Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury. [Quotation marks, citations, and brackets omitted.]

Our Supreme Court has acknowledged that evidence of a defendant's gang affiliation "is relevant . . . when there is fact evidence that the crime at issue is gang-related." *People v Bynum*, 496 Mich 610, 625-626; 852 NW2d 570 (2014). On the other hand, such evidence also generally carries improper propensity connotations. *Id*. at 626 n 28 ("a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior") (quotation marks and citations omitted).

Taylor is correct that the gang evidence *did* tend to support an improper propensity inference. From the evidence presented that Taylor and Watkins were members of the "Turn-around Boys" or "Turn-around Gang," which was sometimes described as a rap group and at other times as a "gang," the jury might well have inferred that defendants had a propensity to commit drive-by shootings precisely like the one at issue here. Even so, evidence is not inadmissible under MRE 404(b)(1) merely because it is capable of supporting an improper propensity inference. "Put simply, the rule is *inclusionary* rather than exclusionary." *People v*

*VanderVliet*, 444 Mich 52, 64; 508 NW2d 114 (1993) (quotation marks and citation omitted), amended in part on other grounds 445 Mich 1205 (1994). In other words, if the disputed evidence is admissible for some proper purpose under MRE 404(b)(1), such as proving motive or identity, it is admissible; it will only be excluded if that is warranted under MRE 403. *Id*. at 74-75.

In this instance, the evidence concerning defendants' membership in the "Turn-around Boys" was relevant as proof of both motive and identity. The evidence tended to show that Williams had not been mistaken when he identified each of the defendants, and it also tended to show that each of the defendants, as members of the Turn-around Boys, had a motive to retaliate against Gantz and Williams, who were members of a rival gang and whom defendants believed were responsible for the April 17, 2015 shooting.

Moreover, on this record, we cannot conclude that the evidence was clearly inadmissible under MRE 403. In this instance, the danger of *unfair* prejudice did not substantially outweigh the gang evidence's probative value. In light of the fact that Williams recanted his earlier identifications of defendants at trial, the evidence of their membership in a gang or rap group that was familiar to both Williams and Gantz was highly probative regarding both identity and motive. Thus, because there was a reasonable basis for admitting the gang evidence, its introduction at trial was not plain error. See *Randolph*, 502 Mich at 10 (holding that "[a] 'clear or obvious' error under the second prong" of the *Carines* plain-error test "is one that is not 'subject to reasonable dispute' ").

Taylor also contends that trial counsel performed ineffectively by failing to object to the introduction of the gang-related evidence. The failure of Taylor's direct claim of error under plain-error review does not *necessarily* preclude him from prevailing with regard to his related claim of ineffective assistance of counsel. See *Randolph*, 502 Mich at 5. Regardless, that claim of error fails on its merits under the *Strickland* test because, even assuming that Taylor's trial counsel should have objected, Taylor has failed to demonstrate a reasonable probability that, but for counsel's failure to do so, the outcome of his trial would have been different. See *Lockett*, 295 Mich App at 187. In the end, this case boiled down to a question of identity, namely, whether the jury believed that Williams's initial statements (and testimony) implicating defendants had been true or whether, instead, it believed his trial testimony disavowing those earlier statements. By contrast, the disputed "gang" evidence was not seemingly of much consequence in deciding guilt or innocence. Therefore, we reject Taylor's claim of ineffective assistance of counsel related to the gang evidence.

Finally, Taylor argues that the prosecutor's "repeated interjection" of the gang-related evidence and arguments constituted prosecutorial misconduct. Because Taylor neither objected to nor requested a curative instruction regarding the disputed evidence or prosecutorial arguments, this issue is unpreserved. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). We review unpreserved claims of prosecutorial misconduct under the *Carines* plain-error standard. *Unger*, 278 Mich App at 235.

As we have already explained, the disputed "gang" evidence was admissible under MRE 404(b)(1) as proof of motive and identity. Consequently, the prosecutor's related arguments concerning such evidence were not plainly improper. See *People v Dobek*, 274 Mich App 58,

76, 80; 732 NW2d 546 (2007) ("A finding of prosecutorial misconduct may not be based on a prosecutor's good-faith effort to admit evidence"); *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003) ("a prosecutor is free to argue the evidence and any reasonable inferences that may arise from the evidence").

Affirmed.


/s/ Kathleen Jansen
/s/ Thomas C. Cameron
/s/ Jonathan Tukel